Hernan Patricio
CASTRO–O'RYAN, Petitioner,

v.

UNITED STATES DEPARTMENT OF IMMIGRATION AND NATURALIZATION, Respondent.

No. 86–7502.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 1987.

Decided July 14, 1987.

As Amended Aug. 10, 1987.

John J. Tally, Law Office of Fred Rosenberg, San Francisco, Cal., for petitioner.

Joseph F. Ciolino and Marshall T. Golding, Washington, D.C., for respondent.

Before HUG, NELSON and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Hernan Patricio Castro-O'Ryan (Castro) appeals a denial of his applications for withholding of deportation and grant of asylum, which were denied by the Board of Immigration Appeals (the Board) on July 2, 1986. We reverse the Board and remand for further consideration.

## FACTS

Castro was born on April 10, 1955 in Vina Del Mar, Chile and is a citizen of Chile. He is married to Blanca Haydee de Maria Arce-Guevara, a Salvadoran woman admitted as a permanent lawful resident of the United States. She has two children by a previous marriage, and they have one child born in 1977 from this marriage.

Castro first arrived in the United States on a tourist visa on February 28, 1976. On his second entry, July 19, 1980, he was admitted as a permanent resident. On May 11, 1981 he was indicted by a federal grand jury for trafficking in cocaine in March and April of 1981, and was specifically charged with selling 1 ounce of cocaine for $1,950 and providing 1 gram of cocaine free to a special agent of the Drug Enforcement Administration. He was also charged with agreeing to sell 17.6 pounds of cocaine at a price of $500,000. On September 23, 1981 the district court found him guilty of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. The count of which he was found guilty included the specifications of sale, gift and agreement to sell cocaine set out above. He was sentenced to 5 years in prison.

Castro served 3 years in a federal prison camp at Florence, Arizona. He was assigned to a carpenter shop and within a year became lead carpenter. His work record was excellent and the prison authorities found him to be "a model prisoner."

He was regarded as "a friendly, congenial and helpful person," and "a stabilizing influence among his fellow inmates."

*Proceedings.* At the beginning of 1985 a deportation hearing was held at the prison facility in Florence before William Nail, Immigration Judge. Judge Nail informed Castro he had a right to be represented by counsel of his choice and arranged that he be furnished a list of organizations which might be able to provide him a lawyer willing to represent him without charge. The judge asked if he wanted to seek legal representation and he replied affirmatively. The deportation hearing was continued to give him an opportunity to obtain counsel.

The hearing resumed on February 1, 1985. Castro was now represented by Daniel Carrasco, who admitted the allegations in the order to show cause why Castro should not be deported. Judge Nail designated Chile as the country of deportation. Castro stated that he wished to apply for withholding of deportation and asylum. The hearing was continued to give him an opportunity to file these applications. He then applied for withholding of deportation and asylum.

In support of his request for asylum Castro prepared an affidavit in February 1985 which, written in his own hand, was filed with the Immigration Judge. It, in relevant part, reads:

Since I was in High School, I had been a sympatizer of the Christian Democratic Party. During my first year of college (1973) I participated actively in the Party, at University Level.

After the coup of 1973, all political parties were declared in recess, and the left wing parties were disolved.

In the University, the followers of the Christian Democratic Party started a movement to pressure the government, by peaceful means, to re-state the democracy in the country.

I became a member of the movement, early in 1974. Soon after I became the Secretary of the movement.

We organized clandestine meetings (public and private meetings were illegal, as they are now).

During 1974 and the first half of 1975 the movement gained force and followers within the student body.

In August, 1975, rumors started with regard to the existance of Army Intelligence Officers, possing as students in the University.

About the same period of time, the movement was planing to get the University into a strike, and through it, pressure the government to make consetions to the dissolved political parties, and at the same time create public unrest that would further pressure the government into making consetions.

Strikes were declared illegal in 1973. On the night of October 21st, 1975 (about 8:00 P.M.), as I left the student's residence, where I lived, in Santiago, during the school season, I was detained and escorted to a waiting Army truck, by two soldiers.

I was ordered to lay face down on the truck's bed and to pull my trousers down to my knees. There were other two civilian detainees with me, in the same position. In the canvas' covered bed of the truck were about 10 soldiers. The ones closer to the tail, closed the tail gate and pulled down the tail canvas.

The Army truck rode for about one hour before coming to a final stop.

We (all three detainees) were order out, to what seemed to be an isolated country estate.

I never saw again the other two detainees.

I was order to remove all my cloth, and locked in a cell, without light, in the basement of the building.

After about two hours, two civilians came for me. I was taken nude to another room on the floor above. It was a walk in freezer, illuminated by very deem lighting. I was order to sat down on a metal chair. I was hand and leg strapped into the metal chair. The two civilians left.

About an hour later the two civilians came back. By this time I was getting close to be frozen in the freezer.

One of the civilians introduced himself as an Army Intelligence Officer.

He was the one that conducted the interrogation. I was asked about my participation in the movement, our plans, the names of other members of the movement. I denied any knoledge of the movement (if I had accepted any of their allegations, they would have had bases for my prosecution; if found guilty, I would have faced at least a long prison

sentence, if not death). After about half an hour of interrogation, it became obvious to me that the Army Intelligence new more about the movement than I did myself. That only meant that they had infiltrated the movement.

After one hour of interrogation, the two civilians left. By this time I was in pain because of the cold, inside the freezer.

Half an hour later, my interrogator, with two soldiers came back. They hose me with high preasure water; unstrapped me, and took me out of the freezer. On my way back to the basement cell, the officer in civil cloth told me to leave the country.

I was given back my cloth and put back on the same cell. After about 4 to 5 hours, two soldiers come for me. I was brought back to the Army truck. Order to lay face down on the floor of the bed of the truck and to pull my trousers down to my knees. This time only two soldiers were on the back of the truck. I was the only civilian.

After half an hour of ride, the truck stopped and I was order out of it. I was left in the southwest suburbs of Santiago. It was 6:30 A.M., October 22nd, 1975. It had been over 10 hours since I was taken into custody.

The same morning I left Santiago, and went to my hometown, Vina Del Mar. I told my family about what happened.

As a consequence of the long exposure to the cold in the freezer I developed pneumonia.

Two weeks after, I returned to the University, to start final examinations; I did not go back to the dormitory other than to remove my properties. I got in touch with the President of the movement, but I avoided contact with everybody else connected to it. I told the President of the movement what had happened to me, and that I was dropping out of the movement. He advised me to leave the country.

For the rest of the school year, final exams, I commuted between my home town and Santiago, staying in Santiago only for the tests.

It wasn't until December, 1975, that, with the development of family events, I, and my family, decided to follow the order from the Army Intelligence Officer. To leave the country.

My uncle, Daniel Castro Lopez (for information see Anmisty International's Records) had been arrested twice in 1973 after his second arrest, he had not been seen again. It was leaked by an Army officer, to a member of my family, who was trying to find out my uncle's whereabouts, that my uncle had been shot and killed by the Army, in one of their concentration camps.

It had only been his second arrest. He was also a member of an outlawed movement.

After obtaining all the necessary travel documents, which I had no problems to obtained, I left Chile the 28th of February, 1976.

My family had decided that the U.S.A. was the closest safe country for me.

On April 30, 1985, Daniel Carrasco withdrew as Castro's counsel. The deportation hearing resumed on June 20, 1985 before Judge Nail at Florence, Arizona. The following colloquy ensued with Judge Nail:

Q. You are here today by yourself, that is you don't have an attorney with you. Does that mean that you intend to speak for yourself today?

A. Yes, I do.

Q. All right.

Judge Nail then questioned Castro, and counsel for the Immigration and Naturalization Service questioned him. Castro told Judge Nail that he had sent him a telegram on June 4, 1985 requesting a change of venue to San Francisco because he had two material witnesses in the San Francisco area and the attorney of his choice was in San Francisco and he could not afford to bring him to Arizona. Judge Nail said he had not received the telegram. He indicated that even if he had received the telegram he might not have granted the request. He then gave his oral decision.

In this decision Judge Nail stated that the evidence of persecution before him consisted of Castro's testimony that he was afraid to return to Chile, the advice he had received to leave Chile, and his account of the killing of his uncle who was an official in the Communist Party. Judge Nail's description of the main incident described by Castro in his affidavit was as follows:

The Respondent stated that about October of 1975, that he was taken into custody by individuals of the Government and that he was held overnight and during

the time that he was held he was questioned and he was mistreated.

Judge Nail concluded:

Except for the one incident described by the Respondent, I have no evidence before me to suggest that the Respondent was ever persecuted in Chile. . . .

Referring to Castro's conviction of conspiracy to traffic in drugs, Judge Nail further ruled:

Even if I felt the Respondent had established that he would, be persecuted in Chile, I would nevertheless, find that he is not eligible for the benefits of Section 208 of the Act or of Section 243(h) of the Act. I find that because of this particular conviction the Respondent is precluded from the benefits of both those Sections.

Castro appealed to the Board. He was represented only by himself, and the Board denied him oral argument. The Board declared that it was satisfied from a review of the record that he had received a fair hearing and had effectively waived his right to counsel.

The Board then stated:

The respondent is statutorily ineligible for withholding of deportation based on his conviction for trafficking in cocaine and does not warrant asylum in the exercise of discretion.

A footnote attached to this sentence declared:

The grounds for statutory ineligibility for withholding of deportation contained in section 243(h)(2) of the Act are not applicable to asylum requests, in exclusion or deportation proceedings, under section 208(a) of the Act. However, the existence of such a statutory bar with regard to the former relief is a significant factor to be considered in determining whether an alien warrants a grant of asylum in the exercise of discretion. *See generally Matter of Salim*, 18 I & N Dec. 311 (BIA 1982).

Castro appealed to this court and is now represented by counsel.

## ISSUE

Was Castro's statutory right to counsel denied?

## ANALYSIS

The importance of counsel for the alien in deportation cases has long been recognized. Over fifty years ago it was observed that in "many cases" a lawyer acting for an alien would prevent a deportation "which would have been an injustice but which the alien herself would have been powerless to stop." National Commission on Law Observance and Enforcement (the Wickersham Commission), *Report on the Enforcement of the Deportation Laws in the United States* 109 (1931). Since 1931 the law on deportation has not become simpler. With only a small degree of hyperbole, the immigration laws have been termed "second only to the Internal Revenue Code in complexity." E. Hull, *Without Justice For All* 107 (1985). A lawyer is often the only person who could thread the labyrinth.

No right to counsel under the Sixth Amendment is recognized in deportation proceedings. *Ramirez v. INS*, 550 F.2d 560, 563 (9th Cir.1977). But where the courts declined to see a constitutional remedy, Congress saw a dictate of humanity. Congress has enacted a statute whose heading reads "Right to Counsel." The statute provides in mandatory language that in any deportation proceedings and in any appeal proceedings the person concerned "shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8 U.S.C. § 1362. The legislative history of this provision confirms that Congress wanted to confer a *right*. *See* H.R. Rep. No. 1365, 82d Cong., 2d Sess. 57, *reprinted in* 1952 U.S.Code Cong. & Admin.News 1653, 1712. Failure to accord an alien this right may, in the light of the entire administrative record, be an abuse of discretion, requiring remand. *Castro-Nuno v. INS*, 577 F.2d 577, 578–79 (9th Cir.1978).

If the prejudice to the alien is sufficiently great, there may indeed be a denial of due process itself. *Ramirez*, 550 F.2d at 563. To make a hearing fundamentally unfair to this degree, "the defect, or practice complained of, must have been such as might have led to a denial of justice, or there must have been absent one of the elements deemed essential to due process."

1420

*Id.,* quoting Justice Brandeis, *Bilokumsky v. Tod,* 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221 (1923). We need not however reach the constitutional issue if we find that the statutory right was not waived and that failure to accord it prejudiced the petitioner. *See United States v. Cerda-Pena,* 799 F.2d 1374, 1377 n. 3 (9th Cir. 1986).

■ Castro asked for the opportunity to have counsel of his choice in San Francisco. Judge Nail never ruled on that request but effectively denied it. Castro's laconic answer to Judge Nail was not an intelligent, voluntary waiver of counsel. The opportunity to obtain counsel was prevented. *Colindres-Aguilar v. INS,* 819 F.2d 259 (9th Cir.1987). *Cf.* Gordon, *Right to Counsel in Immigration Proceedings,* 45 *Minn.L. Rev.* 875, 887 (1961). Without being informed by the immigration judge "of the complexity of [his] dilemma and without any awareness of the cogent legal arguments which could have been made on [his] behalf," Castro did not competently and understandingly waive his statutory right. *Partible v. INS,* 600 F.2d 1094, 1096 (5th Cir.1979).

■ The case is not one where the absence of counsel made no difference. *See, e.g. Ramirez-Osorio v. INS,* 745 F.2d 937, 945 n. 10 (5th Cir.1984); *Cobourne v. INS,* 779 F.2d 1564, 1566 (11th Cir.1986). The denial of counsel was prejudicial. Judge Nail made a serious legal error in his decision. He failed to distinguish between the effect of a conviction for drug dealing on withholding of deportation, where the statute makes the conviction an absolute bar, 8 U.S.C. § 1253(h)(2)(B), *Mahini v. INS,* 779 F.2d 1419 (9th Cir.1986), and the effect of the conviction on a petition for asylum under 8 U.S.C. § 1158. No statutory bar exists to the grant of asylum. *Ramirez-Ramos v. INS,* 814 F.2d 1394 (9th Cir.1987), relied on by respondent, is not to the contrary; although the Board in that case had decided that Ramirez "would not merit a discretionary grant of asylum," Ramirez confined his appeal to the withholding of deportation. *Id.* at 1395. The court, therefore, did not have to address the criteria for the discretionary grant or denial of asylum. *Id.* at 1396. In the instant case the Board relied on its own precedent, *Matter of Salim,* 18 I & N Dec. 311, 315 (BIA

1982), which in turn took as "useful guidelines" regulations directed to the District Director and, in particular, 8 C.F.R. § 208(f)(1)(iv). The regulation does require the District Director to deny asylum to an alien convicted "of a particularly serious crime." We have indicated that the Board properly may refer to these regulations in the exercise of its discretion as to asylum. *Hernandez-Ortiz v. INS,* 777 F.2d 509, 519 (9th Cir.1985); *Del Valle v. INS,* 776 F.2d 1407, 1414 (9th Cir.1985); *Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1288 (9th Cir.1984). But it is one thing to treat the regulations as guidelines pointing to significant factors and another thing for the Immigration Judge or Board to reduce the discretionary function they exercise to bureaucratic application of a rule and to treat the single factor of criminal conviction as an absolute bar; for in that event the significant distinction between the statute governing the withholding of deportation and the statute governing asylum would be destroyed. If Castro had been represented by counsel the obvious difference between the two legal standards would undoubtedly have been drawn to Judge Nail's attention.

A second error occurred through the unwaived absence of counsel. Castro, a carpenter with some education in engineering and a very imperfect command of spoken English, was unable to articulate the basis of his fears of persecution under oral examination by Judge Nail and counsel for the INS. A stark contrast exists between what he was able to put down in writing (which to judge from Judge Nail's decision was never considered by Judge Nail) and the flat, colorless, caricature which Judge Nail sets out as the total evidence of persecution. Lacking the counsel he had asked for, Castro lacked what Alexander Solzhenitsyn has said to be indispensable and missing in totalitarian countries—"a clear-minded ally who knows the law." No one was there to help him tell his story. His case was seriously prejudiced by the lack of legal assistance that Congress had mandated.

■ Castro, it may be observed, had the opportunity to engage counsel to argue his appeal before the Board; he did not do so; he slept on his rights. This argument has force but does not cure the unfair proceeding before Judge Nail on which the Board's opinion rests. Denying oral argument, the

Board made a review of the written record that must at best be termed perfunctory. The Board merely made a conclusory statement that Castro had "competently, understandingly, and voluntarily" decided "to proceed without the assistance of counsel." The Board did not set out the basis for its conclusion and made no effort to examine the effect of the absence of counsel upon the hearing.

The Board's own decision was marked by the failure to apply the appropriate legal criteria. Although, unlike Judge Nail, the Board acknowledged that there was no statutory bar to a petition for asylum, the Board failed to specify the facts in terms of which it was exercising the discretion that Congress has confided to the Attorney General or his delegates.

The Board referred to the drug conviction as "a significant factor to be considered." The Board, however, gave no indication that it had considered any other factor such as Castro's support of his family, his rehabilitation, or the dangers he might experience in Chile. Indeed, as to the evidence that Castro might have met the statutory standard of "a well-founded fear of persecution on account of ... political opinion," the Board did not review the evidence or make any conclusions whatsoever. The Board's opinion reads as though the Board thought that the drug conviction was dispositive.

The government objects that it would have been permissible in the exercise of discretion for Judge Nail and the Board to find that the narcotics conviction was such a significant factor that it outweighed all other factors. *Mahini, supra* 779 F.2d at 1421. But that a given result could be reached after the exercise of discretion does not dispense with the exercise of discretion. Under the regulations which do not bind the Board but which the Board has elected to follow, all relevant factors must be considered. *Matter of Salim, supra* at 315. A "strong negative discretionary factor" may be overborne by "countervailing equities." *Id.* at 316. There is no anomaly in holding that a serious criminal conviction is a bar to mandatory relief from deportation but only a factor in the discretionary grant of asylum. An analogous claim of anomaly by the government was rejected in *INS v. Cardoza-Fonseca,* ——

U.S. ——, ——, 107 S.Ct. 1207, 1219, 94 L.Ed.2d 434 (1987). The distinction between the mandatory and discretionary parts of the statute has "practical significance." *Id.* What the Attorney General and his delegates must exercise is discretion. *Id.* at 1220.

In the exercise of its discretion, the Board must make findings. *Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1455 (9th Cir.1985), *aff'd on other grounds,* —— U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). In order for this court to properly review the Board's determination "we must understand the basis for its decision and how it arrived at the findings underlying that decision." *Id.* at 1455. We must be able to determine from what the Board sets out whether its decision is supported by substantial evidence. *Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1282 n. 9 (9th Cir.1984). Without counsel arguing for the proper application of the proper criteria, the Board did not apply them. But the Board's fundamental error was to affirm a decision reached in a hearing marred by the denial of counsel.

REVERSED AND REMANDED.