**Jesus ESCOBAR–GRIJALVA,**
**Petitioner,**

v.

**IMMIGRATION AND**
**NATURALIZATION SERVICE,**
**Respondent.**

No. 98–71469.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1999.

Decided March 24, 2000.

Abbe Allen Kingston, Kingston, Martinez & Hogan, Santa Barbara, California, for the petitioner.

Heather R. Phillips, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: PREGERSON, NOONAN, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge NOONAN; Dissent by Judge O'SCANNLAIN.

NOONAN, Circuit Judge:

Jesus Escobar–Grijalva petitions for a review of an order of the Board of Immigration Appeals (the Board) denying her asylum and withholding of deportation. Holding that she was denied the right to

counsel given her by 8 U.S.C. § 1362, we grant her petition and remand for proceedings consistent with this opinion.

## PROCEEDINGS

On October 24, 1996 a hearing on Escobar's application for asylum and withholding of deportation was held. She alleged persecution on account of her political opinion in Guatemala. She participated in the hearing through a Spanish-speaking interpreter.

The hearing began as follows:

JUDGE FOR THE RECORD

This is a continued proceeding at Los Angeles, California on October 24, 1996, in deportation proceedings in the matter of Jesus Escobar–Grijalva, A 72 519 396. On behalf the respondent, no attorney or representative has appeared. And on behalf of the Service, general attorney Mr. Alan Youtsler. The official Spanish interpreter and court clerk is Sinyova (phonetic sp.) Lopez.

JUDGE TO MS. ESCOBAR

Q. To the respondent, Ms. Escobar, it is now five after two, over an hour—

A. Oh, wait, wait, Your Honor. I apologize.

Q. Oh, thank you. Over an hour past the scheduled time that your case was scheduled for a hearing. We have waited your attorney. That is, at the last hearing—well, previous hearings you have had various attorneys, Mr. Davis, Ms. McGuire, Ms. Scott, and you continue apparently to be represented by attorneys from that office. Who is your present attorney, because no one is with you.

A. It's a new American one.

Q. A new American one? What is the name of this attorney?

A. I don't know.

Q. Well, where is he, ma'am? I mean, you were sitting here and your attorney's not here.

A. (Indiscernible). He told me that he was already here. But I didn't see him.

Q. Have you even met this new attorney, yet, ma'am? This new American attorney as you described him to be?

A. Yes, I saw him.

Q. What is the name of this attorney? It looks like Jeremy Frost is his name. Is that his name?

A. (Indiscernible).

Q. A man, according to the writing in here, at least. He is still part of the same law office of McGuire and company. But, my question to you, ma'am, is where is any of your attorneys? Where are they?

A. I don't know, it—can you allow me to go out and see.

Q. Well, ma'am, have you seen them today at all? Any of your attorneys?

A. Yes, I did see him.

Q. You saw Mr. Frost?

A. Yes.

Q. Or was this gentleman his assistant that you saw, ma'am? Don't get the two confused.

A. No, it (indiscernible).

Q. Okay, and he said he would be representing you? When did you last see him? When did you last see him ma'am?

A. I just saw him before I got in here. Would you please allow me to go out one moment.

Q. We'll have the court interpreter go out there and call his name.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Back on the record. Off the record, the court interpreter would [list] the respondent's witness.

JUDGE TO MR. FROST

Q. Counsel, I understand you're Jeremy Frost, is that right?

A. That's correct, Your Honor.

JUDGE TO MS. ESCOBAR

Q. Now, ma'am, is this your attorney, Mr. Frost?

A. No.

Q. No?

A. It's another one.

JUDGE TO MR. FROST

Q. Okay, well, counsel, have you ever met your client?

A. No, I haven't, Your Honor. But I'm—I'm from—

[MS. ESCOBAR TO JUDGE]

A. He hasn't seen me.

JUDGE TO THE INTERPRETER

Q. Wait, wait. Let—let her finish. What—what's that?

A. He—it's another gentleman.

Q. Okay, well, Mr. Frost is from the law offices of Terance McGuire. He is one—apparently one of the new attorneys.

A. Actually—

Q. This is not the person you—you met outside? The new attorney you said—the new American attorney?

A. With a black jacket.

JUDGE TO MR. FROST

Q. Counsel, do you have any idea who that is?

A. No, I don't, Your Honor.

Q. Is that one of your assistants maybe? One of your clerks or something?

A. I'm—I'm not even with McGuire's office. I'm with Jim Valanti (phonetic sp.)—Valinoti.

Q. You're with Valinoti? Well—

A. Yeah.

Q. (indiscernible) really confusing me, because your—your notice comes in—in McGuire's office's name, not Valinoti's. And is there some reason why you submitted a notice with another law firm? I mean, I'm really confused now. If you're with Mr. Valinoti's office, why are you submitting a notice under Mr. Terance McGuire's offices?

A. Your Honor, I'm a little confused too. And if I could call a recess for five minutes to just get it clarified. I—I really don't have the answer.

Q. Have you met you client before today, counsel. I mean, right now, because she said she never saw you before until you walked in right now.

A. That's true, Your Honor. I've never met her.

Q. And you're going to be presenting her case?

A. Actually, I was hoping to have time, you know, before, but I just ran from this hearing to this hearing.

MR. YOUTSLER [COUNSEL FOR THE GOVERNMENT] TO JUDGE

Q. I don't think he can represent her. He hasn't ever met her before. He has no idea what her case [is] about.

JUDGE TO MR. FROST

Q. Yeah, counsel, I—at the minimum I'm a little concerned. First of all, whose law firm are you associated with?

A. Jim Valinoti, Your Honor.

Q. Jim Valinoti? Okay, so you're not associated with McGuire, Scott and Company?

A. No, Your Honor. But if I get a chance to talk with Jim, maybe I could get some clarification into who is actually handling this file.

Q. No, counsel. I'm going to ask the respondent what she wants.

A. Okay

JUDGE TO MS. ESCOBAR

Q. Ma'am, do you want this gentleman to represent you?

A. Those are my papers, but if the man is not her—

Q. Well, ma'am, let me tell you, I want to make sure you understand something. You're going to have basically three choices. And let me explain to you what they are. You're going to have the choice, number 1, of choosing this gentleman who

claims he represents you, although never meeting you today yet, to represent and present you case today. Or, you have the choice of proceeding on your own and being your own attorney and representing yourself today and presenting your case. That's the second choice. Or, the third choice is, I will give you a continuance to get a new attorney to represent you. And when I say that, ma'am, if you get a new attorney, it's not going to be any of the following people. And I will not allow them to appear. And that includes Mr. Frost, Mr. McGuire, Mr. Alexander, Ms. Scott or Mr. Davis or Mr. Valinoti or Mr. Cassarian (phonetic sp.). None of those people. Because you see, supposedly this gentleman represents all of them as one of their attorneys. And I'm not about to continue a case for some—one of them from the same law offices to walk in when they should have been ready today to present your case. So if you don't accept Mr. Frost from these law firms, none of those individuals will be representing you at your next hearing. Now if you get a new attorney unrelated to any of them, I don't have a problem. You're more than welcome to do that. But I'm not having one of those attorneys from the same law offices walk in and get a delay because they don't know what's going on with their cases. They're not going to get that continuance for that purpose. They're going to be removed as your attorney, and they're not going to represent you. So, ma'am, of those three choices, what would you like? Mr. Frost to present your case today? You to do it on your own? Or, you can find a new attorney completely separate and apart from any of these attorneys I've mentioned (indiscernible) who have filed notices with me.

A. It's okay. If he doesn't miss again, he doesn't, you know, show up again.

Q. So you want Mr. Frost to represent you? Is that what you said? Choice number 1?

A. I don't know what he said.

Q. That's what I don't know, ma'am. Is that choice number 1 you're selecting?

A. It's okay.

Q. That's fine, ma'am. We're going to proceed then.

The hearing continued, with Frost asking some questions. The IJ denied Escobar's application. She appealed to the Board on substantive grounds and because of such ineffective assistance of counsel as to deprive her of due process of law. The Board affirmed, ruling as to the latter claim that Escobar had "failed to satisfy all the requirements of an ineffective assistance of counsel" claim as set out in *Matter of Lozada,* 19 I & N Dec. 637, 1988 WL 235454 (BIA 1988), aff'd. 857 F.2d 10 (1st Cir.1988).

Escobar petitions for review.

## ANALYSIS

The Board relied wholly on its own precedent, *Matter of Lozada,* for rejection of Escobar's procedural claim. The affirmance of this decision by the First Circuit did not touch on any general procedural requirement necessary to bring an ineffective assistance of counsel claim. *See Lozada v. INS,* 857 F.2d 10 (1st Cir.1988). Consequently, we address only the Board's precedent. The Board did lay down a rule: "A motion based upon a claim of ineffective assistance of counsel should be supported by an affidavit of the allegedly aggrieved respondent attesting to the relevant facts ... [F]ormer counsel must be informed of the allegation and allowed opportunity to respond." Appropriate disciplinary authorities must also be notified. *Matter of Lozada,* 19 I & N Dec. 637, 639, 1988 WL 235454. The Board adopted these rules to handle "the substantial number of claims of ineffective assistance of counsel" coming before the Board and to "highlight the standards which should be expected of attorneys who represent persons in immigration proceedings, the outcome of which may, and often does, have enormous significance for the person." *Id.* at 639–640, 1988 WL 235454.

The Board's reasonable rules for the normal ineffective assistance claim are not dispositive here. The facts are plain on the face of the administrative record—no need of an affidavit to establish them. Frost himself was not Escobar's counsel, nor was she his client—no need to give him a chance to defend himself or to give the bar an opportunity to discipline him. What is puzzling is that anyone concerned with the high standards expected of the immigration bar should indulge the illusion that Frost could have functioned as counsel for Escobar.

To call Frost her lawyer and Escobar his client mocks the meaning of what a lawyer is—a counselor and advocate knowledgeable of the matters on which he or she provides counsel and of the cause he or she represents.

Frost had the presence of mind to say he needed time to talk to Escobar if he was going to represent her. It was not given him. Counsel for the government had the decency to object, "I don't think he can represent her. He hasn't ever met her before. He has no idea what her case is about." Government counsel's advice was ignored by the IJ, who proceeded to extract from Escobar the response "It's okay"—a response equivocal because what "it" refers to is not clear, and Escobar had just said, "I don't know what he said," apparently referring to the "options" offered by the judge.

The IJ seems nearly as confused as Escobar. He, first, identifies Frost with the McGuire law firm, then announces that he, the judge, is "really confused." The judge goes on to exclude seven lawyers from being Escobar's counsel if she chooses a continuance. The judge does so, continuing to confuse Frost with the McGuire office and exercising an unheard-of prerogative of denying a petitioner the choice of counsel without any hearing for her or for any of the disqualified attorneys.

Escobar did not knowingly and freely consent to have Frost as her counsel. Unprepared and unknowledgeable about her case, Frost was incapable of instant transformation into her own counsel. The IJ was exasperated because Escobar's hearing had been continued before the October 24, 1996 hearing due to failures of Escobar's counsel to show up. But the IJ's understandable exasperation did not give him authority to exclude seven lawyers as possible future counsel and to force a person upon Escobar who had just walked in off the street and had no more understanding of her case than a stranger.

Deprivation of the statutory right to counsel deprives an alien asylum-seeker of the one hope she has to thread a labyrinth almost as impenetrable as the Internal Revenue Code. *Castro–O'Ryan v. U.S. Dept. of Immigration and Naturalization*, 847 F.2d 1307, 1312 (9th Cir.1987). The IJ's action denying Escobar the right to choose counsel was an abuse of discretion requiring remand for rehearing with such counsel as she "shall choose." 8 U.S.C. § 1362. *Castro–Nuno v. INS*, 577 F.2d 577, 578–79 (9th Cir.1978).

The administrative record in this case points to serious problems in the immigration bar. It gives a picture of attorneys shuffling cases and clients, imposing on immigration judges and on hapless petitioners alike. There is a need to clean house, to get rid of those who prey on the ignorant. The starting point is not to make the helpless the victims.

The petition is GRANTED. The case is REMANDED.

O'SCANNLAIN, Circuit Judge, dissenting:

Because I do not believe that Escobar has successfully made out a claim of ineffective assistance of counsel, I must respectfully dissent.

I

With the greatest respect, I disagree with the court's interpretation of the statute governing legal representation in immigration proceedings. Section 1362 does not require that Escobar be represented

by skilled counsel; indeed, it does not even suggest that she have counsel at all. 8 U.S.C. § 1362. The statute merely says that, if she so desires, she has "the privilege of being represented." To have the privilege of being represented is not to have a right to counsel that the state must enforce. Indeed, the statute explicitly declares that whatever counsel Escobar may retain, it shall be done so "at no expense to the Government." Since the government is prohibited from paying for Escobar's representation, then there is the obvious possibility that she may not be represented at all. How then is it possible for her cries of ineffective counsel to merit relief? No counsel is fine, poor counsel is not. The majority's reading of this statute is baffling.

## II

If Escobar does have a viable claim for ineffective assistance of counsel, it can lie only upon a showing that her counsel was "so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause." *Ramirez–Durazo v. INS,* 794 F.2d 491, 500 (9th Cir.1986). The majority evidently believes that the confusion surrounding the opening of Escobar's hearing was a constitutional violation though it cites no authority for this proposition. Of course, the majority reaches its conclusion without looking at all at the substance of Escobar's hearing, which covered her arrival in the United States, the reasons that she departed Guatemala, her brother's membership in a political party and subsequent assassination, the threats that she received, her life in Mexico before arriving in the United States, and the nature of her fear of returning to Guatemala. After guiding her through this broad-ranging discussion of her asylum claim, her putative counsel then successfully qualified Escobar for voluntary departure. Escobar had ample opportunity to be heard fully and fairly before the Immigration Judge. Her representation was certainly not stellar, but it was hardly a violation of the Constitution. I cannot agree with the majority's conclusion that it was.

The majority has done more than simply conclude that Escobar's representation violated the Constitution, however, it has presumed so. We have long acknowledged the rule that the petitioner must show prejudice arising from the conduct of her attorney to prevail on this claim. *See, e.g., Mohsseni Behbahani v. INS,* 796 F.2d 249, 251 (9th Cir.1986). Escobar has made no such argument. Unlike the majority, I decline to entertain arguments that the parties themselves choose not to plead.

## III

I must also take issue with the majority's treatment of what it describes as the "Board's reasonable rules for the normal ineffective assistance of counsel claim." Maj. op. at 3468. The Board has explicitly made clear its adherence to the procedures outlined in *Matter of Lozada,* 19 I. & N. Dec. 637, 1988 WL 235454 (B.I.A.1988), *aff'd,* 857 F.2d 10 (1st Cir.1988), and our sister circuits have adopted the procedures it sets forth. *See, e.g., Henry v. INS,* 8 F.3d 426, 439 (7th Cir.1993); *Esposito v. INS,* 987 F.2d 108, 110–12 (2d Cir.1993). *Lozada* explicitly sets forth three requirements for supporting a claim of ineffective assistance of counsel: (1) an affidavit by the alien setting forth the agreement with counsel regarding the alien's representation; (2) evidence that counsel was informed of the allegations and allowed to respond; and (3) an indication that a complaint has been lodged with the bar, or reasons explaining why not.

The majority simply recasts these rules to suit its fancy. No affidavit is needed, proclaims the majority in debuting its own rule, when the record is clear. And counsel need not be informed here because he was not really counsel. Then whose assistance, pray tell, does the majority believe was ineffective? The majority would have us believe that Escobar *was* represented for the purposes of establishing such representation was ineffective, but *was not*

represented for the purposes of following the Board's reasonable rules. Unfortunately, we do not enjoy the adversary's luxury of reasoning in the alternative. Escobar made no attempt to comply with the *Lozada* requirements. We therefore cannot entertain her claims of ineffective assistance of counsel on this record.

### IV

As to the merits of Escobar's claim, I note that the majority has not even attempted to analyze them. Given the substantial evidence that exists in the record to support the Board's decision, I would have no difficulty affirming the Board's ruling, and I therefore respectfully dissent.