**Julio BALTAZAR–ALCAZAR; Maria Guadalupe Baltazar, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 02–73363.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 2004.

Filed Oct. 21, 2004.

Vincent Chan, Pasadena, CA, Sung U. Park, Los Angeles, CA, for the petitioners.

Paul Fiorino and Cindy S. Ferrier, United States Department of Justice, Office of Immigration Litigation, Civil Division, Washington, DC, for the respondent.

* The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation.

Before: McKEOWN, BYBEE, Circuit Judges, and BREYER, District Judge.*

McKEOWN, Circuit Judge.

Julio Baltazar–Alcazar ("Mr. Baltazar") and Maria Guadalupe Baltazar ("Mrs. Baltazar") petition for review of a Board of Immigration Appeals ("BIA") order denying their application for suspension of deportation. The issue before us is whether the Baltazars were denied the right to counsel when the immigration judge banned an entire law firm from representing them at their deportation hearing. We conclude that the Baltazars did not knowingly and voluntarily waive their statutory right to counsel of choice and that they were prejudiced by the denial of that right. We grant the petition for review.

## I. BACKGROUND

The background and sequence of the proceedings is important to our decision, so we recount the events in some detail. The Baltazars, both born in Mexico, entered the United States without inspection and have lived here since 1989. In late 1996, the Immigration and Naturalization Service ("INS") commenced separate deportation proceedings against each of them. Judge Martin presided over Mr. Baltazar's case, and Mrs. Baltazar's case was assigned to Judge Latimore. In the preliminary stages of the proceedings, James Valinoti represented both of them. Each admitted the factual allegations in the order to show cause, conceded deport-

ability, and applied for suspension of deportation.

On the day of Mr. Baltazar's originally-scheduled merits hearing, his counsel, Valinoti, delivered a substitute notice of appearance indicating that Stephen Alexander would be representing Mr. Baltazar. Neither Alexander nor Valinoti showed up for the hearing.

Frustrated by the attorneys' failure to appear, the judge told Mr. Baltazar: "[W]e can do one of two things, either I can give you an opportunity to retain other counsel, *someone other than an attorney from Mr. Valinoti's office or from Mr. Alexander's office.* Alternatively, you can proceed and speak for yourself." (emphasis added). Mr. Baltazar expressed his desire to find another attorney and the judge set a new date for his hearing. Judge Martin gave Mr. Baltazar a list of local legal aid agencies and cautioned him that if he failed to retain counsel by the date of the continued hearing, he would be expected to proceed pro se.

Before the rescheduled date for Mr. Baltazar's hearing, Mrs. Baltazar's case was consolidated with her husband's and transferred to Judge Martin. The motion to consolidate the cases was submitted to Judge Martin by Monica Hagan, an attorney from Valinoti's office. The Baltazars arrived for their consolidated merits hearing with Hagan as their attorney. At the outset of the hearing, Judge Martin played a recording of the earlier proceeding during which he banned Valinoti's entire firm from representing Mr. Baltazar. Judge Martin explained that the Baltazars' options were to "[e]ither go ahead and speak pro se before this Court, have Ms. Hagan represent just the female respondent separately and just have the case sent back to Judge Latimore or any other proposal that you care to make to the Court."

After a recess to confer with Hagan, the Baltazars appeared before Judge Martin without their counsel. The following colloquy regarding the Baltazars' representation by counsel ensued:

Q: Well, to the female respondent, what do you wish to do? Do you wish to have your case heard with your husband's and go ahead and speak today or do you wish a continuance and have your case sent back to Judge Latimore where you can seek representation of anybody you wish before Judge Latimore?

A: I want to continue with this case together with my husband. I don't want us to be separated.

Q: Well, unfortunately your husband's case should have been heard a long time ago and it was not solely because of the fact that his attorneys did not appear with him and this matter's been dragging on for over two year's [sic] time. Are you saying you want to get another attorney to represent you?

A: I want to continue with the same attorneys we had before. We've spoken to them, they've apologized and they gave us a reason why they couldn't come last time.

Q: All right. Well, . . . if you'd like to have the same attorneys represent you, then I would suggest that your case proceed separately before Judge Latimore. I've had no such explanation from either Mr. Alexander or Mr. Valinoti and I previously advised your husband that, you know, either he obtained other counsel for purposes of the merits hearing or that he be prepared to speak for himself. You've indicated that you wish to continue to be represented by counsel. You have that right. You don't have a right nec-

essarily to have your case heard with your husband's case.... And since I believe your right to counsel takes precedence over any right to anything else and you've indicated that you want to have the same counsel represent you, I'm going to sever your case from your husband's and return it to Judge Latimore for further hearing and if, as you have stated, you wish to have Mr. Valinoti's [sic] represent you, then you will be free to do so.... Do you understand?

A: Yes, one moment, but—

Q: Do you understand?

A: If that's not possible, in other words what I want to do is to continue the case but not get separated. But if it can't be done, then okay.

Q: Well, I'll go off the record one moment and ask Judge Latimore if she's willing to hear both of your cases together. But if she's not, then your case will be going back to Judge Latimore and I will hear your husband's case here. I will not permit counsel to represent your husband in the hearing before this Court, given the previous inconvenience caused by counsel to this Court. This is a situation that we have a continuing problem with here in Los Angeles. Counsels are retained and changed on short notice out in the hallways, they come in frequently unprepared and it's—the situation is very frustrating for the Court and about all I can do when I'm inconvenienced as I was on the day that I previously set for your husband's merits hearing, when I was ready to go but he wasn't ready to go because of the failure of counsel to communicate with each other or failure of your husband to communicate with counsel or whatever, the bottom line is all I can do is say, "Fine, we'll put it over and give the respondent another chance to retain counsel and if he doesn't, proceed pro se." And that's pretty much what we've done here and I'm not going to—I'm going to hold to that position in this case.

Judge Martin then went off the record and contacted Judge Latimore. When Judge Latimore refused to take the consolidated cases, Judge Martin again asked Mrs. Baltazar what she wanted to do:

Q: So the question is do you want to go ahead and speak for yourself pro se with your husband's case today or do you want me to sever your case from your husband's and just hear yours separately represented by counsel of your choice at another time?

A: No, I'd like to continue together with my husband without an attorney.

Q: Without an attorney?

A: Without an attorney.

Q: All right. That's your choice.

The Baltazars, whose primary language is Spanish and who have only a sixth grade education, presented their case pro se. Judge Martin determined that the Baltazars met the continuous presence and good moral character requirements for suspension of deportation,[1] but found that they

---

1. Because the INS commenced deportation proceedings against the Baltazars before April 1, 1997 and the final agency order was entered after October 31, 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") transitional rules apply. *See Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir.1997). Under the transitional rules, an applicant "may apply for the pre-IIRIRA remedy of suspension of deporta-

failed to establish extreme hardship either to themselves or to their United States citizen daughter. The Baltazars appealed to the BIA, alleging that they were denied due process because they were not permitted to be represented by their attorney of choice at the consolidated merits hearing. The BIA held that the Baltazars waived their right to counsel and "have not alleged or demonstrated on appeal what testimony or evidence they were unable to present which would have established their eligibility for suspension of deportation." The BIA affirmed the IJ's decision, and this appeal followed.

## II. DISCUSSION

### A. THE RIGHT TO COUNSEL

■ The right to counsel in removal proceedings is derived from the Due Process Clause of the Fifth Amendment and a statutory grant under 8 U.S.C. § 1362. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir.2004) ("Although there is no *Sixth Amendment* right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the *Fifth Amendment* guarantee of due process that adhere to individuals that are subject to removal hearings.") (emphasis added); *Castro–O'Ryan v. United States Dep't of Immigration and Naturalization*, 847 F.2d 1307, 1312–13 (9th Cir.1987) ("Congress has enacted a statute whose heading reads 'Right to Counsel.'.... Congress wanted to confer a *right*. ... If the prejudice to the alien is sufficiently great, there may indeed be a denial of due process itself."); *Colindres–Aguilar v. INS*, 819 F.2d 259, 261 n. 1 (9th Cir.1987)

("Petitioner's right to counsel is a statutory right granted by Congress under 8 U.S.C. § 1362, and it is a right protected by the fifth amendment due process requirement of a full and fair hearing.").

In creating a statutory right to counsel, Congress recognized that aliens have a great deal at stake in removal proceedings and acknowledged the importance of representation by an attorney in those proceedings. As the Supreme Court explained long ago:

> Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

*Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945).

The statute governing the right to counsel in removal proceedings, which is entitled "Right to counsel," reads, in its entirety:

> In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) *by such counsel, authorized to practice in such proceedings, as he shall choose.*

---

tion if deportation proceedings against her were commenced before April 1, 1997." *Jimenez–Angeles v. Ashcroft*, 291 F.3d 594, 597 (9th Cir.2002). To establish eligibility for suspension of deportation, an alien must show that he or she has been physically present in the United States for the last seven years, is a

person of good moral character, and that deportation will "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence...." 8 U.S.C. § 1254(a) (1996).

8 U.S.C. § 1362 (emphasis added); *see also* 8 U.S.C. § 1229a(b)(4)(A) ("the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings").[2] The plain language of the statute provides that, so long as there is no cost to the government, a petitioner has the right to be represented by an attorney of his choice who is authorized to practice before the INS.[3] Because the record is unequivocal that the Baltazars chose Hagan to represent them, the issue we address is whether, as the BIA found, the Baltazars waived their statutory right to counsel of choice.

### B. No Waiver Of Counsel Of Choice

"We have repeatedly explained that for an applicant to appear *pro se,* there must be a knowing and voluntary waiver of the right to counsel." *Tawadrus,* 364 F.3d at 1103 (citing *Velasquez Espinosa v. INS,* 404 F.2d 544, 546 (9th Cir.1968)). What occurred here does not pass muster under the well established principles for waiver of counsel in immigration cases: "In order for a waiver to be valid, an IJ must generally: (1) inquire specifically as to whether petitioner wishes to continue without a lawyer; and (2) receive a knowing and voluntary affirmative response." *Id.* (internal citations omitted).

Judge Martin never asked Mr. Baltazar if he wished to proceed pro se, and neither of the Baltazars gave "a knowing and voluntary affirmative response" regarding waiver. *Id.* To the contrary, the Baltazars made clear that they wanted to proceed with Hagan as their attorney. Instead, Judge Martin summarily barred Hagan from representing Mr. Baltazar and forced Mrs. Baltazar into a Hobson's choice—undo the consolidation and proceed in a separate hearing or proceed pro se because Hagan was barred from Judge Martin's courtroom. Judge Latimore's refusal to take the consolidated cases foreclosed the third option of proceeding with Hagan before a different judge. The upshot was that the Baltazars were not permitted to be represented by counsel of their choice—Hagan—because she was from Valinoti's law firm.

The notion of banning an entire law firm from representing a petitioner, without providing either the attorney or the petitioner a hearing or opportunity to be heard on the exclusion, is extraordinary. Hagan came to court with her clients, prepared and ready to represent them and proceed with the deportation hearing. Unlike the attorneys that Judge Martin previously expressed concern about, Hagan was not new counsel "retained or changed on short notice out in the hallways." Indeed, the consolidated hearing was not her first representation of the Baltazars. She had previously filed the motion to consolidate the Baltazars' cases. Nothing suggests that Judge Martin had any prior difficulties with Hagan that

---

**2.** The language of the regulation entitled "Representation" is consistent with the statutory text: "The alien may be represented in proceedings before an Immigration Judge by an attorney or other representative of his choice in accordance with 8 C.F.R. part 292, at no expense to the government." 8 C.F.R. § 3.16(b) (1999).

**3.** The regulations in effect at the time of the Baltazars' hearing provided that any attorney who "is a member in good standing of the bar of the highest court of any State, possession, territory, Commonwealth, or the District of Columbia, and is not under any order of any court suspending, enjoining, restraining, disbarring, or otherwise restricting him in the practice of law" is authorized to practice in deportation proceedings. *See* 8 C.F.R. §§ 1.1, 292.1 (1999).

might have justified a ban. In fact, the judge offered no reason for her exclusion other than the fact that she was associated with Valinoti's firm. We have found no authority that supports a wholesale law firm ban under these circumstances.

We are mindful of the frustrations and strain on judicial resources caused by attorneys who fail to appear for scheduled court proceedings, who occasion needless continuances, who disrupt the court's docket, who are unprepared, and who represent clients on the fly. Admittedly, as judges on the court of appeals, we do not face these problems on a daily basis.

For this reason, we are particularly respectful of Judge Martin's observations and the obvious pressure placed on the system by such attorney antics. Nonetheless, these concerns cannot overshadow the Baltazars' statutory right to counsel of choice. Mr. Baltazar was being penalized not for his attorney's conduct in his own case, but for the attorney's alleged misconduct in other cases and for the judge's understandable frustration with Valinoti's law firm.

Notably, this is not the first time that we have been presented with an effort to disqualify Valinoti's firm. Hagan's disqualification brings up many of the same concerns we expressed in *Escobar–Grijalva v. INS*, 206 F.3d 1331, 1335 (9th Cir. 2000), in which we held that an IJ denied a petitioner's right to counsel by banning seven attorneys from Valinoti's law firm from representing her. After some confusion regarding which attorney from Valinoti's law firm was representing Escobar–Grijalva, the IJ gave Escobar–Grijalva three options that, like the alternatives the Baltazars faced, were not really choices at all. Namely, Escobar–Grijalva could: (1) proceed with an attorney from Valinoti's firm who happened to be present but knew nothing about the case; (2) proceed pro se; or (3) get a continuance to find a new attorney with the caveat that the attorney could not be one of seven attorneys from Valinoti's firm. *Id.* at 1334. After Escobar–Grijalva proceeded with the attorney unfamiliar with her case, had her petition denied, and unsuccessfully appealed the denial, we held that forcing petitioner to a choice that "mock[ed] the meaning of what a lawyer is" denied Escobar–Grijalva her right to counsel. *Id.*

In that case, as here, the judge "exercis[ed] an unheard—of prerogative of denying a petitioner the choice of counsel without any hearing for her or for any of the disqualified attorneys." *Id.* at 1335. And, in both cases, a ban that was intended to discipline the attorneys effectively punished the petitioner.[4]

Under the circumstances, we have no trouble concluding that, like the ban at issue in *Escobar–Grijalva*, the wide-ranging ban imposed on the Baltazars reaches too far.[5] Not only does the record not

---

4. Because the ban was so broad, we have no occasion to consider whether a ban limited to the offending attorneys would have been appropriate.

5. The agency's own regulations do not support such a ban. The regulation entitled "Discipline of attorneys and representatives" says: "The Immigration Judge ... may suspend or bar from further practice before the Executive Office for Immigration Review or the Service, or may take other appropriate action against, *an attorney or representative* if it is found that it is in the public interest to do so." 8 C.F.R. § 292.3(a)(1999). Nowhere do the regulations refer to suspending an entire law firm. The same regulation provides that an attorney is entitled to a hearing before disciplinary action is taken. Subsection (b)(iv), entitled "Hearing," states, in relevant part: "The Chief Immigration Judge shall designate an Immigration Judge to hold a hearing and render a decision in the matter." *Id.*

support a knowing and voluntary waiver, predicating a waiver on the summary disqualification of an entire law firm violates the statutory right to counsel of choice.

## C.  PREJUDICE INQUIRY

Our final inquiry is whether the Baltazars were prejudiced by the denial of their statutory right to counsel. The Ninth Circuit has yet to decide whether prejudice is required when a petitioner has demonstrated denial of the right to counsel in deportation proceedings. *See United States v. Ahumada–Aguilar*, 295 F.3d 943, 950 (9th Cir.2002) ("It remains unsettled in this circuit whether a showing of prejudice must be made where the right to counsel has effectively been denied a respondent in a deportation hearing."); *Colindres–Aguilar*, 819 F.2d at 262 ("[I]t is unsettled whether there must be a showing of prejudice where, as in this case, counsel has been effectively denied."); *Rios–Berrios v. INS*, 776 F.2d 859, 863 (9th Cir.1985) ("We leave to another day the issue of whether there must be a showing of prejudice in a case in which counsel has been effectively denied."). Because the Baltazars were in fact prejudiced by the denial of their right to counsel, we once again defer to another day the question of whether prejudice is required.[6]

A showing of prejudice "require[s] the petitioner to show only that the IJ's conduct 'potentially[affected] the outcome of the proceedings.'" *Colmenar v. INS*, 210 F.3d 967, 972 (9th Cir.2000) (quoting *Cam-*

*pos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999)) (second alteration in original). The petitioner "need not explain exactly what evidence he would have presented in support of his application...." *Cano–Merida v. INS*, 311 F.3d 960, 965 (9th Cir. 2002) (internal quotation marks omitted).

■ Although failure to demonstrate extreme hardship was the only basis for denial of the Baltazars' petition, demonstrating extreme hardship is no easy task, as extreme hardship has no fixed definition. Rather, it "is evaluated on a case-by-case basis, taking into account the particular facts and circumstances of each case." 8 C.F.R. § 1240.58(a). As we explained in *Gutierrez–Centeno v. INS*:

> The Board has ... enumerated various factors to be considered in evaluating a claim of extreme hardship. These include the age and health of the alien; family ties in the United States and abroad; length of residence in the United States; economic and political conditions in the country to which the alien is to be deported; financial status; possibility of other means of adjustment of status; special assistance to the United States or the community; immigration history; and position in the community. Moreover, as the BIA has recently stated, "This list was not meant to preclude consideration of aspects of hardship which do not fit squarely within one of these nine factors."

99 F.3d 1529, 1533 n. 8 (9th Cir.1996) (internal citations omitted).[7]  A petitioner

---

**6.** The other circuits that have addressed this issue are split on whether prejudice is required. *Compare Snajder v. INS*, 29 F.3d 1203, 1207 (7th Cir.1994) (no prejudice required), *Montilla v. INS*, 926 F.2d 162, 168 (2d Cir.1991) (same), *and Cheung v. INS*, 418 F.2d 460, 464 (D.C.Cir.1969) (same), *with Ogbemudia v. INS*, 988 F.2d 595, 598 (5th Cir. 1993) (prejudice required), *Farrokhi v. INS*, 900 F.2d 697, 702 (4th Cir.1990) (same), *and*

*Michelson v. INS*, 897 F.2d 465, 468 (10th Cir.1990) (same); *see also Ponce–Leiva v. Ashcroft*, 331 F.3d 369, 385 (3rd Cir.2003) (Rendell, J., dissenting) ("Although we have expressed our 'misgivings' with the view that a showing of prejudice is necessary under the circumstances, it is a question on which we have yet to rule" (internal citations omitted)).

**7.** The regulation addressing extreme hardship provides additional factors that were not spe-

must weave together a complex tapestry of evidence and then juxtapose and reconcile that picture with the voluminous, and not always consistent, administrative and court precedent in this changing area. *See* Richard D. Steel, *Steel on Immigration Law* § 14:29 (2d ed. 2003) ("What is sufficient to meet the requisite level of hardship has been the subject of extensive litigation.").

These factors and related legal requirements are daunting enough for a seasoned immigration lawyer. *See* Charles Gordon et al., 6 *Immigration Law and Procedure* § 74.07[5][f][iii] (2004) ("administrators, courts, and attorneys must continue to cope with the nebulous and undefined standard of extreme hardship"). It is no wonder we have observed "[w]ith only a small degree of hyperbole, the immigration laws have been termed second only to the Internal Revenue Code in complexity. A lawyer is often the only person who could thread the labyrinth.'" *Castro–O'Ryan*, 847 F.2d at 1312 (internal citations and quotation marks omitted). That observation is nothing new or earth shattering. *See id.* ("Over fifty years ago it was observed that in many cases a lawyer acting for an alien would prevent a deportation which would have been an injustice but which the alien herself would have been powerless to stop." (internal citation and quotation marks omitted)).

■ In short, demonstrating extreme hardship is not bean counting or adherence to a magic mathematical formula. The weight, strength, and breadth of evidence, as well as the balance among the factors, play into the hardship determination. We have little doubt that the Baltazars, with their limited command of English and even less experience with the American legal system, would have benefited from counsel and that they were prejudiced in proceeding without counsel of choice—counsel who was present and ready to represent them.

Even a cursory review of the record reveals that the Baltazars did not understand their role in the proceeding and surely did not understand that they bore the burden of demonstrating extreme hardship. *See Castaneda–Delgado v. INS*, 525 F.2d 1295, 1299 (7th Cir.1975) ("It cannot be thought that [the petitioners] had any real knowledge of American law and procedure or of their legal rights."). When Judge Martin asked Mr. Baltazar, "If the Court requires you to leave the United States, would that cause you hardship?", he responded: "No, that would be your decision." When the judge later asked Mr. Baltazar if there was anything more he wanted to add in support of his application, he again responded: "No, I really believe it's your decision."

Similarly, the Baltazars' testimony about their backgrounds, albeit heartfelt, shows no appreciation for the legal requirements for suspension of deportation. Despite their limited command of English, lack of education, and failure to appreciate their burden to demonstrate extreme hardship, the Baltazars did present facts that form the basis of a hardship claim. Surely "[r]etained counsel could have better marshalled specific facts in presenting petitioner's case...." *Colindres–Aguilar*, 819 F.2d at 262; *see also Rios–Berrios*, 776 F.2d at 863 (holding that "[we] are convinced that his asylum case will be more advantageously presented by retained counsel."). The facts surrounding the Baltazars' family relationships, their residence

---

cifically acknowledged in *Gutierrez–Centeno*. The factors include: "The age, number and immigration status of the alien children and their ability to speak the native language and adjust to life in the country of return;" "[t]he impact of a disruption of educational opportunities;" and "the psychological impact of an alien's deportation." 8 C.F.R. § 1240.58(b).

in the United States since their teenage years, the potential impact of deportation on their United States citizen child, and Mrs. Baltazar's disability "might all have been favorably developed by [their] chosen lawyer who was thoroughly familiar with the details." *See Chlomos v. INS,* 516 F.2d 310, 314 (3rd Cir.1975).

Of course, our role is not to second guess the hardship decision or even to speculate how it might ultimately come out with a lawyer marshaling the facts in concert with the law. Rather, we conclude that the Baltazars were prejudiced by the denial of their right to counsel and that they should be given an opportunity to exercise their statutory right to "counsel of choice."

**PETITION GRANTED. REMANDED for proceedings consistent with this opinion.**