Marco Antonio GONZALES–
NEYRA, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 96–70467.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1997.

Decided Sept. 15, 1997.

Randall Caudle, San Francisco, CA, for Petitioner.

Marshall Tamor Golding, Ann V. Crowley, United States Department of Justice, Washington, DC, for Respondent.

Before: SCHROEDER, KLEINFELD, Circuit Judges, and WALLACH, U.S. Court of International Trade Judge.*

* The Honorable Evan J. Wallach, United States Court of International Trade, sitting by designation.

SCHROEDER, Circuit Judge:

Marco Antonio Gonzales–Neyra is a native and citizen of Peru who petitions for review of the Board of Immigration Appeals' denial of his application for asylum and withholding of deportation, 8 U.S.C. §§ 1158(a), 1253(h). Petitioner paid "protection" money to "Sendero Luminoso" (also known as "Shining Path") guerrillas while he believed that they were Peruvian police officers. Upon concluding that they were revolutionaries whose cause he politically opposed, he told them so and refused to comply with their demands any longer. As a result, he received threats on his business and his life, and he fled the country.

A divided BIA denied his application, holding that he had not established a well-founded fear of persecution on account of political opinion. In so holding, the majority of the BIA, and the immigration judge, overlooked the uncontradicted evidence that petitioner's life and business had been threatened only after he expressed his political disagreement with the guerrilla organization, and only after he made clear that his refusal to make further payments was on account of that disagreement.

We conclude that any rational factfinder who took that evidence into account, as the BIA was required to do in this case, would be compelled to reach a contrary conclusion: that the persecution Gonzales–Neyra suffered was on account of political opinion; that given Gonzales–Neyra's showing of past persecution, his fear of future persecution was reasonable; and that there is a clear probability that Gonzales–Neyra will be persecuted if he were returned to Peru. Therefore, we grant Gonzales–Neyra's petition for review.

## BACKGROUND

The facts are as petitioner testified. The immigration judge expressly found his testimony credible because there were no inconsistencies in that testimony and no contradictory evidence regarding the events that took place before petitioner fled Peru.

Petitioner operated a video game business in Lima. Like many other business people in Peru, he became the target of extortion demands. The demands upon him began in April of 1990, when two men dressed in police uniform, purporting to be members of the Peruvian national police, demanded that he provide protection money "for police use." These men told Gonzales–Neyra that if he did not pay, "they were going to see to it that [his] business was [declared] illegal, or that they would do whatever possible to harass [him] in [his] business or close [his] business." When they demanded that he pay $300 per month, Gonzales–Neyra complied. Every month thereafter, from May 1990 until January 1991, two men dressed in police uniforms came to Gonzales–Neyra's video store to demand payment.

As of December of 1990, Gonzales–Neyra began hearing rumors that the Shining Path guerrillas were using the same kind of extortionist tactics as the police, to obtain money from business persons. He testified this meant that "they were destroying businesses and killing people." He began to suspect that the men to whom he was paying the protection money were not members of the national police force, but rather members of the Shining Path. Because he did not share the Shining Path guerrillas' ideology, and in fact, as a university student had been a member of the Christian Popular Party, whose ideas "were to enrich and increment democracy ... within the country[,]" in stark contrast to the goals of the Shining Path, Gonzales–Neyra decided that he would no longer make the payments.

In January of 1991, Gonzales–Neyra confronted the men who came to get the protection payment. When he demanded to know if they were in fact Shining Path guerrillas, they "clarified [his] suspicions, because they confirmed ... that they were members of the Sendero Luminoso Communist Party." At that point, Gonzales–Neyra told them that he would no longer give money to support their "armed struggle." They responded that if he "didn't do it, they were going to kill [him]. They were going to destroy [his] business and [him] inside of it." In addition, the guerrillas chastised him for being involved in the video game business. They said that in their opinion, a video game business such as his distracted the youth, made them stupid, and "diverted their attention

from national problems." The men also ordered him to close his business soon, because it "was not in accordance with their ideology, and that if [he] didn't do it, they were going to kill him."

Petitioner testified that he paid the $300 to the guerrillas that day because he was afraid he would be killed on the spot, but that he specifically told them that he was not going to "collaborate [with] them [anymore], because that was not part of [his] idea; that [he] was not going to collaborate with a group that was trying to destroy [his] country." Soon after the incident, Gonzales–Neyra fled his home and business. Before fleeing, however, he learned from a newspaper that the police had detained two men whom he recognized as the men who had first come to his establishment in 1990. The press reported that the police had identified them as members of the Shining Path. Believing that the guerrilla group might now retaliate against him thinking that he was the one who had reported the men to the police, Gonzales–Neyra's fear became even stronger.

Sometime soon after his confrontation with the guerrillas, and while Gonzales–Neyra was living in hiding at his girlfriend's house before his departure from Peru, his family reported disturbing incidents. Unknown persons, who claimed to be his friends, started coming to his family's house, asking for him. Because Gonzales–Neyra's family knew who his friends were, they did not believe that these people had innocent motives. After his departure from Peru, Gonzales–Neyra was told by his family that people would call his parents' home, saying that it was urgent that he be in touch, and demanding that the family provide information as to his whereabouts. In addition, Gonzales–Neyra's father began observing unknown people loitering on several occasions on the street in front of the family home. In February of 1991, Gonzales–Neyra's family was threatened that if it did not disclose his whereabouts, his younger brother would be harmed. Because of that threat, his brother went into hiding for a year.

The immigration judge concluded that Gonzales–Neyra had failed to show that his fear was "on account of political opinion." The judge reasoned that while the guerrillas may have extorted money from Gonzales–Neyra in order to fund their armed struggle, they had not targeted him for extortion because of his political opinion. In affirming the immigration judge's order, the BIA rested on similar reasoning.

The BIA also found that Gonzales–Neyra had not established a well-founded fear of future persecution because conditions in Peru had changed. The BIA relied upon portions of a State Department report, *Peru: Profile of Asylum Claims and Country Conditions* (February 1995), which, when reviewed as a whole, supports petitioner's claim of continued Shining Path insurrection in the country at least as strongly as it supports the BIA's position that conditions have changed for the better. This point was brought out dramatically by BIA member Rosenberg, who dissented from the BIA's decision.

> The breadth of the guerrilla efforts to destabilize the country was reflected in the variety of targets of their violence, including government officials, military and police personnel, politicians, industrialists, businessmen, bankers and other professionals, development and human rights workers, educators and students, labor leaders and workers, Indians, peasants, religious personnel and foreigners.

> Because so many categories of Peruvians have been targeted, some asylum applicants may have difficulty providing evidence that they were threatened or abused on Convention-covered grounds, precisely because any person or group perceived by the Shining Path as in a position to aid or thwart its efforts to overthrow the government is a potential target of its threats or violence. In certain cases, applicants with credible cases of guerrilla mistreatment may merit administrative discretion.

## ANALYSIS

■■■ An alien is eligible for asylum and may be granted asylum at the discretion of the Attorney General, if he establishes that he is a statutory "refugee". 8 U.S.C. § 1158(a). A "refugee" is an alien who is unable or unwilling to return to the country of his nationality "because of persecution or a well-founded fear of persecution on account of ... political opinion." 8 U.S.C.

§ 1101(a)(42)(A). The burden of proof is on the alien to establish eligibility for asylum. *Sangha v. INS,* 103 F.3d 1482, 1487 (9th Cir.1997) (citing *Ghaly v. INS,* 58 F.3d 1425, 1428 (9th Cir.1995)). The alien must do this by offering "credible, direct, and specific evidence[.]" *Prasad v. INS, [Kamla Prasad],* 47 F.3d 336, 338 (9th Cir.1995) (citation omitted).

■■■ After the Supreme Court's decision in *INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), an asylum seeker claiming to be a victim of persecution on account of political opinion must offer evidence that (1) he has been a victim of persecution; (2) he holds a political opinion; (3) his political opinion is known to his persecutors; and (4) the persecution has been or will be on account of his political opinion. *Sangha,* 103 F.3d at 1487. Likewise an asylum seeker claiming well-founded fear of persecution must show the second, third and fourth elements, though not necessarily the first.

We may reverse the BIA's decision only if the evidence presented by Gonzales–Neyra is such that a reasonable factfinder would be compelled to conclude that the requisite fear of persecution existed. *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 483–84, 112 S.Ct. 812, 815 n. 1, 816–17, 117 L.Ed.2d 38 (1992); *Sangha,* 103 F.3d at 1487.

Gonzales–Neyra provided evidence that he was persecuted, that he had a political opinion, that he expressed it to his persecutors, and that they threatened him only after he expressed his opinion. We therefore conclude that petitioner proved through compelling and undisputed evidence that the threats to his life and business constituted persecution causally connected to his political opposition to the Shining Path. *See Sangha,* 103 F.3d at 1486.

The government's focus on the Shining Path's economic motivation for the extortion demands is misplaced, as was the immigration judge's and the BIA's. It ignores the evidence that the Shining Path representatives made it quite clear to Gonzales–Neyra that his political views motivated their hostility and threats after the January 1991 confrontation. Thus, the fact that the guerrillas may have initially chosen Gonzales–Neyra as

a target for money because he was a successful businessman, does not relate to their subsequent motivation for persecuting him. The persecution of which Gonzales–Neyra complains is not the extortion, but the threats upon his life and business that were made after the guerrillas learned of his political orientation.

In addition, we find no basis for the government's suggestion that the threats were on account of Gonzales–Neyra's economic inability to provide payments. Indeed, everything in the record suggests that he was financially able to pay and that his business, which was derided by the guerrillas, was economically viable.

Because we conclude that Gonzales–Neyra established past persecution on account of his political opinion, we also hold that he was entitled to a rebuttable presumption that he had a well-founded fear that he would be similarly persecuted in the future. *See Prasad v. INS [Gaya Prasad],* 101 F.3d 614, 617 (9th Cir.1996) (citing 8 C.F.R. § 208.13(b)(1)(i)).

The State Department report, on which the BIA selectively relied to find that the situation in Peru had changed, does not rebut the presumption raised by Gonzales–Neyra's evidence of past persecution. As noted earlier, and pointed out by the dissenting BIA member, much of the report supports petitioner's claim that he has reason to fear similar persecution in the future. Because Gonzales–Neyra's evidence was not rebutted by the INS, we hold that petitioner was eligible for asylum on account of political opinion.

■■■ Eligibility, however, does not automatically entitle an alien to asylum: the grant of asylum is discretionary. *Kazlauskas v. INS,* 46 F.3d 902, 905 (9th Cir.1995); 8 U.S.C. § 1158(a). The BIA stated that even if Gonzales–Neyra had shown past persecution on account of political opinion, the BIA would still not exercise its discretion in his favor "given the unlikelihood of future persecution[,]" and given the fact that Gonzales–Neyra had failed to "establish[ ] that any mistreatment of him was so severe as to merit ... a discretionary grant of asylum to him particularly in light of the [changed po-

1297

litical climate in Peru.]" This hypothetical exercise of discretion rests on no firmer ground than the BIA's conclusion that petitioner was ineligible for asylum consideration, and constitutes an abuse of discretion.

 While the granting of asylum is discretionary, withholding of deportation to a particular country is mandatory if the Attorney General determines that the alien's "life or freedom would be threatened in such country on account of ... political opinion." 8 U.S.C. § 1253(h); *INS v. Cardoza-Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). A petitioner's deportation must be withheld if the petitioner has established a "clear probability of persecution," in other words that it is "more likely than not" that the alien would be persecuted if he were returned to his country. *Ghaly,* 58 F.3d at 1429 (citations omitted). Even though the standard for withholding of deportation is more stringent than the well-founded fear of persecution standard, *Cardoza-Fonseca,* 480 U.S. at 427–32, 107 S.Ct. at 1210–13 "[s]ome forms of past persecution trigger a presumption that the applicant is entitled to withholding of deportation." *Surita v. INS,* 95 F.3d 814, 821 (9th Cir.1996) (quoting to 8 C.F.R. § 208.16(b)(2)). The regulation provides:

If the applicant is determined to have suffered persecution in the past such that his life or freedom was threatened in the proposed country of deportation on account of ... political opinion, it shall be presumed that his life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.

8 C.F.R. § 208.16(b)(2). We have observed that "[a] key factor in finding evidence sufficient for withholding of deportation is whether harm or threats of harm were aimed against petitioner specifically." *Vilorio-Lopez v. INS,* 852 F.2d 1137, 1141 (9th Cir. 1988). As a result of the Shining Path threats, this petitioner left his business, went into hiding, and was hunted thereafter. The INS did not establish by a preponderance of the evidence that conditions in Peru have changed to such an extent that it is no longer more likely than not that Gonzales–Neyra would be persecuted upon his return. Thus, we hold that Gonzales–Neyra has met the requirements for withholding of deportation.

PETITION GRANTED, REMANDED for further proceedings.