**Douglas CARDENAS; Elizabeth Napa; Douglas Omar Cardenas; Sharon Cardenas; Cheryl Cardenas, Petitioners,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 01–70557.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 2002.

Filed June 12, 2002.

Curtis Pierce, Esq., Los Angeles, CA, for the petitioners.

Robert D. McCallum, Jr., Michael P. Lindemann, and Janice K. O'Grady, Esq., Washington, DC, for the respondent.

Before REINHARDT, GRABER, Circuit Judges, and HUNT, District Judge.*

Opinion by Judge REINHARDT; Dissent by Judge GRABER.

## OPINION

REINHARDT, Circuit Judge.

Petitioner Douglas Cardenas ("Cardenas"), and his spouse and three children, natives and citizens of Peru, petition for review of the Board of Immigration Appeals' ("BIA") denial of their asylum and withholding of deportation applications.[1] We conclude that the BIA erred in determining that Cardenas has not established a well-founded fear of future persecution by the Shining Path, grant the petition for review, and remand for further proceedings consistent with this opinion.

---

* The Honorable Roger Hunt, United States District Judge for the District of Nevada, sitting by designation.

1. The applications of the other members of the Cardenas family, with the possible exception of the two oldest children, as discussed in the text in Part V, are derivative of Cardenas's application.

## I. Factual Background

Cardenas testified to the following at his asylum hearing before the Immigration Judge ("IJ"):

Cardenas, his wife, Elizabeth Napa ("Napa"), and their three children, Sharon Cardenas, Douglas Omar–Cardenas, and Cheryl Cardenas, are natives and citizens of Peru. Cardenas was employed by a merchant shipping company, which shipped merchandise from Peru's port at Lima. The Cardenas family was targeted by the Shining Path, a violent revolutionary organization, because it suspected Cardenas of providing information to the government regarding the organization, in part because his brother was a police official. Cardenas received several written death threats from the Shining Path, and the Cardenas home was painted with the words "Alive the Shining Path" and "Die all those dogs of the Christian war." Because he feared their threats, Cardenas agreed to assist the Shining Path by providing supplies and medicine to the organization, using his position at the ports. In 1992 or 1993, the Shining Path asked Cardenas to transport explosives on behalf of the organization. Cardenas agreed to do so, but instead fled Peru for the United States. Upon his return two months later, Cardenas was greeted by more death threats; he then moved away from his home in Lima, where he resided with his wife and children, to the small town of Canete. After he had been living in Canete for six months, he returned to Lima where he received the following death threat from the Shining Path on his answering machine: "[We][are] getting close to [you] and either way [we][are] going to get [you.]." [2] Cardenas and his family then fled Peru and came to the United States, seeking asylum.

## II. Procedural Background

The IJ denied the Cardenas family's applications for asylum and withholding of deportation. Petitioners filed a timely appeal of the IJ's decision to the BIA. On March 8, 2001, the BIA affirmed the IJ's decision and denied their applications after finding only one small part of Cardenas's testimony not credible,[3] and concluding that the evidence did not establish past persecution. More important, the BIA concluded that Cardenas failed to show that his fear of future persecution by the Shining Path was reasonable in light of his ability to relocate within the country. The BIA based its determination that he had not established a well-founded fear of persecution by the Shining Path *solely* on its conclusion that Cardenas "[had] not established that his fear of persecution by the Shining Path would exist for him country wide." This determination, in turn, was based on the evidence that Cardenas was able to live elsewhere in Peru for six months without harm, and on the State Department Country Report on Peru that showed "a weakening of the reach of the Shining Path." [4] The BIA also denied the applications of the two oldest children, Cheryl and Sharon, on the ground that

---

**2.** Cardenas' precise testimony was as follows: "I found a message in my machine which said, these—I was getting—they were getting close to me and either way they were going to get me."

**3.** Cardenas testified at the hearing before the IJ that the Shining Path had managed to get a false criminal charge lodged against him in order that the police would locate him and prevent his departure from the country. The BIA discredited this portion of his testimony because he had not related these events on his asylum application or at his asylum interview. We, too, disregard this testimony.

**4.** Cardenas also contended that he was persecuted by the Peruvian government. The BIA determined that he did not establish a well-founded fear of future persecution by the government, and we conclude that substantial evidence supports this determination.

they were no longer eligible for derivative status as they had reached the age of twenty-one after the hearing before the IJ.

The Cardenas family filed a petition for review of the BIA's decision in this court, contending that the BIA erred in concluding that they did not have a well-founded fear of future persecution because they had not shown that their fear of persecution extended country-wide.[5]

The transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") apply to the Cardenas family's appeal because the BIA's decision was rendered on or after October 31, 1996, and deportation proceedings were initiated prior to April 1, 1997. Specifically, 8 U.S.C. § 1105a (1994), as amended by IIRIRA § 309(c)(4) (setting forth the transitional rules for judicial review), governs this court's exercise of jurisdiction.

## III. Standard of Review

 Because the BIA in this case conducted an independent review of the IJ's findings, this court reviews the BIA's decision, and not that of the IJ. *Lal v. INS*, 255 F.3d 998, 1001 (9th Cir.), *as amended by* 268 F.3d 1148 (9th Cir.2001). To establish statutory eligibility for asylum, an applicant must show that he is "unable or unwilling" to return to his country "because of [past] persecution or a well-founded fear of [future] persecution on account of" certain statutory grounds, including imputed political opinion. *Zahedi v. INS*, 222 F.3d 1157, 1162 (9th Cir.2000) (citation and internal quotation marks omitted). This court reviews the BIA's denial of an application for asylum on the ground that the alien has not established eligibility for asylum, for substantial evidence. *Ochave v. INS*, 254 F.3d 859, 861–62 (9th Cir.2001). Therefore, the BIA's determination must be affirmed if supported by reasonable, substantial and probative evidence in the record. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

## IV. Cardenas's Ability to Relocate Within Peru

 The BIA rests its conclusion that Cardenas was ineligible for asylum relief

---

**5.** They also made the following separate claims: (1) The BIA erred in making its adverse credibility determination; (2) the BIA erred in concluding that the Cardenas family had not established past persecution; (3) the BIA erred in concluding that, as of the time of the BIA decision, so much time had passed that the Cardenas family no longer had a well-founded fear of future persecution from the government; (4) the BIA erred by making this determination without providing the Cardenas family with an opportunity to respond; and (5) it would be a deprivation of due process to deny Cardenas's eldest children asylum because they no longer met the age requirements for a derivative claim by a child although they did so at the time of the application.

The INS contends that this court does not have jurisdiction over the Cardenas family's claims regarding the adverse credibility determination because Cardenas did not raise this challenge before the BIA, and therefore failed to exhaust his administrative remedies as required under the law. Because the BIA dealt thoroughly with the adverse credibility issue in its opinion, and in fact, made a different determination than the IJ, our review is not barred by Cardenas's failure to raise this challenge before the BIA. *See Socop–Gonzalez v. INS*, 272 F.3d 1176, 1186 (9th Cir.2001)(en banc). We reject the claim on the merits, however, because substantial evidence supported the BIA's determination that Cardenas's testimony with respect to the claim regarding the false criminal charge was not credible. Because we also reject Cardenas's claim of persecution by the government on the grounds that he has neither suffered past persecution at the hands of the government, nor established a well-founded fear of future persecution by the government, we reject claims 3 and 4 on the merits. As we explain later, we need not consider claim 2, and we discuss claim 5 in Part V, *infra*.

on its determination that Cardenas has not met his burden of showing that, despite his fear, he could not relocate elsewhere in Peru. The INS regulations governing asylum applications place the burden on the applicant who has not established past persecution to show "that it would not be reasonable for him ... to relocate" within his country, unless the persecution he fears is perpetrated by a government or sponsored by a government. 8 C.F.R. 208.13(b)(3)(i). Where an asylum applicant has shown past persecution, the burden is placed on the INS to show that it would be reasonable for him to relocate within the country. The BIA asserted that the threats that Cardenas received did not rise to the level of past persecution, and therefore placed the burden with respect to relocation on him. It is not necessary for us to decide whether Cardenas's evidence is sufficient to establish past persecution because, in reaching its decision with respect to his ability to relocate, the BIA failed to mention critical evidence of the direct threat that Cardenas received when he returned from Canete—evidence that, in light of all of the other evidence regarding threats by the Shining Path, compels the conclusion that Cardenas met his burden under the law of showing that he could not safely relocate within Peru.

The BIA does not assert that the threats Cardenas received from the Shining Path before moving to Canete, or the threat he received thereafter, were insufficient to establish a well-founded fear of persecution; nor does it question that the threats were actually made by the Shining Path over a period of time; nor, finally, does it suggest that the threats were insufficient to give rise to a well-founded fear of persecution were Cardenas to continue to live in his home city of Lima. Its decision is based solely on the fact that he need not fear the Shining Path if he moves to another part of the country. Therefore, the issue is whether there is substantial evidence in the record to support the conclusion that, while Cardenas may have a well-founded fear of persecution in Lima, he has failed to show that he would have such a fear if he were to move elsewhere in Peru. The record contains no substantial evidence supporting that conclusion.

■ First, Cardenas testified that he received a direct threat after his six month absence in which the Shining Path informed him that it would get to him wherever he was located. The BIA found Cardenas credible on all points except one, on which we affirm its adverse credibility finding. Given that the BIA did not question the credibility of Cardenas's testimony as to the direct threats he received, including the final one, we must accept his statements as true. *Navas v. INS*, 217 F.3d 646, 652 n. 3 (9th Cir.2000); *Maldonado–Cruz v. U.S. Dep't of Immigration & Naturalization*, 883 F.2d 788, 792 (9th Cir. 1989). Thus, there can be no real dispute that the final threat was made. The INS asserts in a post-argument letter that the source of the threat was never conclusively identified, and that Cardenas only "speculated" that the threat came from the Shining Path. That post-hoc litigation argument is wholly unpersuasive. On the basis of the record before the BIA, there is no evidence that would support the possibility that the threat was made by anyone other than the Shining Path. The terrorist organization had made threats against Cardenas in the recent past, both before and after his two-week trip to the United States, and no one else had done so. We do not require corroborating evidence of a persecutor's identity precisely because, as this court has frequently stated, persecutors often do not identify themselves to their victims. *See Aguilera–Cota v. INS*, 914 F.2d 1375, 1380 (9th Cir.1990) ("There is nothing novel about the concept that persecutors cannot be expected to conform

to arbitrary evidentiary rules established by the Immigration and Naturalization Service; 8551 [they] have [not] been given adequate notice that our government expects them to sign their names and reveal their individual identities when they deliver threatening messages."). Given the context of the prior threats Cardenas had received from the Shining Path, there is no reasonable alternative but to conclude that the Shining Path also made the latest threat.[6] When viewed in the light of the past threats made against him, the final threat that Cardenas would not be safe anywhere in Peru necessitates a finding of a well-founded fear of persecution. *See Lim v. INS,* 224 F.3d 929, 935–36 (9th Cir.2000); *Navas,* 217 F.3d at 658.

Second, that Cardenas was able to live in Canete for six months prior to receiving the final threat does not affect our conclusion. We have found that a "post-threat harmless period" of far longer than that did not vanquish an asylum claim. In *Lim,* the petitioner, who claimed asylum on the basis of persecution in the Philippines, was able to live in the country without harm for *six years* after receiving a series of death threats, yet we found that Lim established a well-founded fear of persecution. 224 F.3d at 935. Here, Cardenas was able to relocate for only six months before he received a threat in which the Shining Path asserted that his relocation would be no obstacle to their harming him. Certainly, this would establish that it would be neither safe nor reasonable for him to relocate within the country.

Third, the State Department Report does not assert that the geographical reach of the Shining Path had been reduced, but, to the contrary, that there were numerous killings and terrorist attacks, and alludes

only to the possibility of temporary safe relocation for *some* targets. We have repeatedly held that "the determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of the particular information contained in the relevant country reports." *Chand v. INS,* 222 F.3d 1066, 1079 (9th Cir.2000). Nothing in the State Department Report indicates that Cardenas would be safe from the Shining Path in any area of Peru. Indeed, in an asylum case concerning allegations of persecution by the Shining Path, this court held, only ten months before the IJ's determination in this case, that the Shining Path had an "extensive and ongoing impact" in Peru. *Velarde v. INS,* 140 F.3d 1305, 1312 n. 6 (9th Cir.1998) (citing *Gonzales–Neyra v. INS,* 122 F.3d 1293, 1295 (9th Cir.1997)). The country report, read as a whole, does not rebut Cardenas's showing of a well-founded fear of persecution, and if anything, supports it.

In light of the foregoing, there is no substantial evidence in the record to support the BIA's conclusion that Cardenas failed to meet his burden of showing that his fear of persecution extended country-wide.

## V. Eligibility for Asylum and Withholding of Deportation

█ Because Cardenas has met his burden of showing that it would not be reasonable for him to relocate, and because the availability of internal relocation was the only basis upon which the BIA found that he did not have a well-founded fear of persecution by the Shining Path, we re-

---

**6.** In its post-argument letter, the INS also describes the threat as "vague." The BIA, of course, did not offer any such characterization of the threat in its decision. In fact, the threat was anything but "vague." Its meaning was quite clear and precise: "We will get you *wherever* you are."

verse the BIA's determination with respect to Cardenas's eligibility for asylum. We also hold that Cardenas has shown a well-founded fear of future persecution, and that it is more likely than not that he would be persecuted if he were to return to Peru, because he has received a direct threat from a terrorist organization that is actively engaged in political persecution; on this basis we grant Cardenas withholding of deportation. *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir.1999).

Because Cardenas is eligible for asylum, and entitled to withholding of deportation, his wife, Elizabeth Napa, and his son, Douglas Omar Cardenas, are also eligible for asylum and entitled to withholding of deportation: their applications are derivative of Cardenas's application. Cardenas's two oldest children, Cheryl Cardenas and Sharon Cardenas, however, reached the age of 21 after the IJ's decision but prior to the BIA's, and according to the BIA, lost their eligibility for derivative status in the interim. We are aware of no cases, and the INS cites none, that consider the issue of whether children of asylum applicants who reach the age of 21 after the IJ's decision but prior to the BIA's lose their eligibility for derivative status where the IJ's decision is eventually found to be erroneous, and relief should have been granted while the children were still eligible. We remand to the BIA for it to consider whether children lose their derivative status in such circumstances.

## VI. Conclusion

We therefore grant the petition for review and remand the case to the BIA for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

GRABER, Circuit Judge, dissenting:

I respectfully dissent.

The BIA concluded that the lead Petitioner had failed to meet his burden to establish that it would not be reasonable for him to relocate within Peru. In my view, the record does not compel a contrary finding.

The majority relies on a single telephone message to support its conclusion that the record *compels* a finding that Petitioner had a well-founded fear of future persecution, despite the absence of past persecution. Several things are unclear about the evidence pertaining to that message, for example: (a) whether the relevant testimony is part of the sequence that the BIA found not credible; (b) whether this message actually came from the Shining Path or was left by someone else; (c) what "either way" referred to; (d) whether the message was a death threat or a threat to have Cardenas arrested on a false charge; and (e) when the message was left on the machine. The pertinent questions and answers at the hearing were:

Q. Sir, excuse me, but you just testified that out of the clear blue sky the Peruvian police sought to arrest you for being involved in the—in the making or giving over of phony documents including visas. Why would they—why would they suspect a person like you who worked for a shipping company or a ship building company, who is not a government official? Why would they suspect you of being involved in any of this?

A. That person said that I had given those documents in order for him to get the visa. When I returned from Canete ... to my house [in Lima] *I found a message in my machine which said,* these—I was getting— *they were getting close to me and either way they were going to get me.*

Q. Who was getting close to you?

A. The Shining Path.

(Emphasis added.) Ambiguity matters, because our standard of review is very deferential.

Most likely this sequence was part of the testimony that the BIA discredited, which pertained to a supposedly false charge against Petitioner that the Shining Path had filed with the police; it comes in the middle of that discussion.[1] At all events, the majority resolves every ambiguity in favor of Petitioner, whereas our standard of review requires us to resolve every ambiguity in favor of the decision-maker below.

Even assuming that there was a threatening message on the answering machine and that it came from the Shining Path: (a) no threat against Cardenas ever had been accompanied by actual harm; and (b) the message did not reach him in Canete and there is no evidence that Cardenas' enemies knew he had been there or would find him there.

The latter observation brings me to my second point, the country conditions report. The report contains this section discussing the topic of internal relocation:

Another consideration affecting the adjudication of Peruvian asylum claims involves *internal relocation. This is available to many applicants.* Although the police and military are spread too thinly to protect every one threatened by the terrorists, *Peru is a large, rugged country, and the terrorists operate with relatively unsophisticated communications. There is no evidence that a nationwide terrorist information network for tracking perceived targets exists.*

For those who feel threatened from whatever source, a well-developed informal mechanism exists within the Peru-

vian non-governmental human rights community to aid and even temporarily relocate within or outside the country those who feel they may be in danger from either side.

(Emphasis added.)

That passage supports the BIA's assertion that "the State Department's country profile (Exh. 6) indicates a weakening of the reach of the Shining Path." The majority's treatment of the report fails to take account of the part that addresses specifically the realistic prospects for successful internal relocation. And the prospects for Petitioner's relocation within Peru were more than theoretical. He had, in fact, successfully relocated to Canete where, he testified, he was working and he was "safe."

The record does not, in my view, compel us to overturn the BIA's conclusion that Petitioner failed to establish a well-founded fear of future persecution. Accordingly, I dissent.

1. This probably accounts for the BIA's not discussing the telephone message separately.