**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JACQUELINE CANALES-VARGAS,
                                    *Petitioner,*

v.

ALBERTO R. GONZALES,* Attorney
General,

                                    *Respondent.*

No. 03-71737

Agency No.
A72-136-915

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted August 9, 2004**
San Francisco, California

Filed March 21, 2006

Before: Harry Pregerson, Alex Kozinski, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Pregerson;
Dissent by Judge Kozinski

---

*Alberto Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States. *See* Fed. R. App. P. 43(c)(2).

**This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

## COUNSEL

Rhoda Wilkinson Domingo, San Francisco, California, for the petitioner.

Victor M. Lawrence, Office of Immigration Litigation, U.S. Dept. of Justice, Civil Division, Washington, D.C., for the respondent.

## OPINION

PREGERSON, Circuit Judge:

An Immigration Judge ("IJ") denied Petitioner Jacqueline Canales-Vargas' applications for suspension of deportation, asylum, and withholding of deportation. The Board of Immigration Appeals ("BIA") affirmed without opinion. We have jurisdiction under 8 U.S.C. § 1252. For the reasons set forth below, we grant Canales-Vargas's petition in part and remand to the BIA for further proceedings.

## BACKGROUND[1]

---

[1]Our recitation of the facts is derived largely from Canales-Vargas's testimony. Because the IJ did not make an adverse credibility determination against Canales-Vargas, her testimony must be taken as true. *See Navas v. INS,* 217 F.3d 646, 652 n.3 (9th Cir. 2004) ("Where the BIA does not make an explicit adverse credibility finding, we must assume that the applicant's factual contentions are true.").

Canales-Vargas is a native and citizen of Peru. She first entered the United States in 1986 and stayed until May 1989, when she then returned to Peru. She reentered the United States in December 1990. She claims that in April 1990, while she was in Peru, she attended a political rally where she gave a speech denouncing the terrorist group Sendero Luminoso (the "Shining Path"). After the rally, she began receiving threatening notes and phone calls of escalating severity, including some that threatened her with death if she did not leave Peru.

Specifically, beginning two or three weeks after she spoke at the political rally in April 1990, Canales-Vargas received five or six threatening notes and various threatening phone calls. The last threatening phone call came just before she left Peru in November 1990. In addition to threats to harm only her, Canales-Vargas also received a note threatening to place a bomb in her house and kill her family if she failed to leave Peru. According to Canales-Vargas, the letters and phone calls became more aggressive and menacing over time. Originally, the threats told her to "shut up" and "not to speak about things [she] did not know about." Eventually, however, the letters and phone calls threatened her and her family with death if she did not leave Peru.[2] The IJ concluded that Canales-Vargas was statutorily ineligible for suspension of deportation because she lacked continuous physical presence

---

[2]Canales-Vargas also claims in her opening brief that she was shot four times by members of the Shining Path. As both the Government and our dissenting colleague properly note, *see* Dissent at 2964 n.1, these facts are not in the record and appear to be a vestige from a different immigration case that Canales-Vargas' attorney cut-and-pasted into the brief in this case. Of course, we do not hold the sloppiness of Canales-Vargas' attorney against Canales-Vargas herself. *Cf. Escobar-Grijalva v. INS*, 206 F.3d 1331, 1335 (9th Cir. 2000) ("The administrative record in this case . . . . gives a picture of attorneys shuffling cases and clients, imposing on immigration judges and on hapless petitioners alike. There is a need to clean house, to get rid of those who prey on the ignorant. The starting point is not to make the helpless the victims.").

in the United States. The IJ also concluded that Canales-Vargas was not entitled to asylum or withholding of deportation because she failed to establish that she suffered past persecution or faced any threat of future persecution if returned to Peru. The BIA affirmed the IJ's decision without opinion. Canales-Vargas petitions for review of her final order of removal.

## STANDARD OF REVIEW

Because administrative proceedings commenced before April 1, 1997, and the final administrative order was issued after October 30, 1996, the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 (1996), apply to this case. *See Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir. 1997). Where, as here, the BIA affirms the decision of the IJ without opinion, we review the decision of the IJ as the final agency decision. *See Falcon Carriche v. Ashcroft,* 350 F.3d 845, 849 (9th Cir. 2003). We review the BIA's decision that Petitioner has not established entitlement to suspension of deportation or eligibility for asylum or withholding of deportation for substantial evidence. *See Lopez-Alvarado v. Ashcroft*, 381 F.3d 847, 850-51 (9th Cir. 2004); *Wang v. Ashcroft*, 341 F.3d 1015, 1019-20 (9th Cir. 2003).

## DISCUSSION

## I. Suspension of Deportation

**[1]** To qualify for suspension of deportation under IIRIRA's transitional rules, Canales-Vargas must have been in the United States continuously for seven (7) years before being served with an Order to Show Cause ("OSC") as to why she should not be deported. *See Lopez-Urenda v. Ashcroft*, 345 F.3d 788, 791-792 (9th Cir. 2003) (applying the pre-IIRIRA seven-year continuous presence requirement to transitional rules cases); *Jimenez-Angeles v. Ashcroft*, 291 F.3d

594, 598 (9th Cir. 2002) (applying IIRIRA's "stop-clock" provision, which ends an alien's period of continuous presence upon being served an OSC, to transitional rules cases). An applicant will fail to maintain continuous physical presence if she "has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days." 8 U.S.C. § 1229b(d)(2); *see also Lagandaon v. Ashcroft*, 383 F.3d 983, 986 n.1 (9th Cir. 2004) (noting that a twenty-day absence did not interrupt petitioner's period of continuous physical presence).

**[2]** Here, Canales-Vargas was served with an OSC on November 9, 1993. Thus, to qualify for suspension of deportation, Canales-Vargas must have been in the United States continuously since November 9, 1986. Canales-Vargas does not satisfy the seven-year continuous presence requirement, however, because she admits that she took an eighteen-month-long trip to Peru from May 1989 to December 1990.[3] Accordingly, Canales-Vargas is ineligible for suspension of deportation.

---

[3]The IJ denied Canales-Vargas' suspension application by applying the pre-IIRIRA rule that "brief, casual, and innocent" departures are exempted from the seven-year continuous presence requirement. *See Aguilera-Medina v. INS*, 137 F.3d 1401, 1402 (9th Cir. 1998) (citing *Rosenberg v. Fleuti*, 374 U.S. 449 (1963)). The 90/180 rule that we apply today replaced the "brief, casual, and innocent" standard for determining when a departure breaks continuous physical presence, *see Mendiola-Sanchez v. Ashcroft*, 381 F.3d 937, 939 (9th Cir. 2004), and we have reluctantly concluded that the 90/180 rule is not impermissibly retroactive when applied to petitioners — like Canales-Vargas — who left the country for more than 90 days before IIRIRA's passage, *see id.* at 941 ("[W]e pause in recognition of the injustice of this result."); *see also Garcia-Ramirez v. Gonzales*, 423 F.3d 935, 941 (9th Cir. 2005) (Fisher, J., concurring) ("reluctantly" applying 90/180 rule).

## II. Asylum

### A. *Applicable Legal Standard*

**[3]** To be eligible for asylum, Canales-Vargas must establish that she is a refugee — namely, that she is a person unable or unwilling to return to Peru "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Sael v. Ashcroft*, 386 F.3d 922, 924 (9th Cir. 2004); 8 U.S.C. § 1101(a)(42)(A). The source of the persecution must be the government or forces that the government is unwilling or unable to control. *See Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004).

**[4]** To be "well-founded," an asylum applicant's "fear of persecution must be both subjectively genuine and objectively reasonable." *Sael*, 386 F.3d at 924. "An applicant 'satisfies the subjective component by credibly testifying that she genuinely fears persecution.' " *Id*. (quoting *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir. 1999)). An asylum applicant "generally satisfies the objective component in one of two ways: either by establishing that she has suffered persecution in the past or by showing that she has a good reason to fear future persecution." *Id.* (quoting *Mgoian*, 184 F.3d at 1035). While a well-founded fear must be objectively reasonable, it "does not require certainty of persecution or even a probability of persecution." *Hoxha v. Ashcroft*, 319 F.3d 1179, 1184 (9th Cir. 2003). "Even a ten percent chance that the applicant will be persecuted in the future is enough to establish a well-founded fear." *Sael*, 386 F.3d at 925 (quoting *Knezevic v. Ashcroft*, 367 F.3d 1206, 1212 (9th Cir. 2004)).

### B. *Analysis*

#### 1. *Past Persecution*

**[5]** Canales-Vargas may demonstrate past persecution on account of a political opinion with evidence that (1) she has

been a victim of persecution; (2) she holds a political opinion; (3) her political opinion was known to her persecutors; and (4) the persecution has been on account of her political opinion. *See Gonzales-Neyra*, 122 F.3d 1293, 1296 (9th Cir. 1997) (citing *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997)). Proof of past persecution gives rise to a presumption of a well-founded fear of future persecution and shifts the evidentiary burden to the government to rebut that presumption. *See, e.g., Popova v. INS*, 273 F.3d 1251, 1259 (9th Cir. 2001).

**[6]** "In asylum and withholding of deportation cases, we have consistently held that death threats alone can constitute persecution." *Navas*, 217 F.3d. at 658; *see also, e.g., Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004); *Siong v. INS*, 376 F.3d 1030, 1039 (9th Cir. 2004); *Khup v. Ashcroft*, 376 F.3d 898, 903 (9th Cir. 2004) (quoting *Navas*, 217 F.3d at 658); *Njuguna v. Ashcroft*, 374 F.3d 765, 770 (9th Cir. 2004); *Rios v. Ashcroft,* 287 F.3d 895, 900 (9th Cir. 2002); *Lim v. INS*, 224 F.3d 929, 935 (9th Cir. 2000); *Del Carmen Molina v. INS*, 170 F.3d 1247, 1249 (9th Cir. 1999); *Briones v. INS*, 175 F.3d 727, 729 (9th Cir. 1999); *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir. 1998); *Gonzales-Neyra*, 122 F.3d at 1296; *Gonzalez v. INS*, 82 F.3d 903, 909-10 (9th Cir. 1996); *Gomez-Saballos v. INS*, 79 F.3d 912, 916 (9th Cir. 1996); *Aguilera-Cota v. INS*, 914 F.2d 1375, 1383-84 (9th Cir. 1990).

Arguably, Canales-Vargas's credible testimony did not establish that the threats that she received "inflict[ed] sufficient suffering or harm to compel a finding of past persecution." *Lim*, 224 F.3d at 936 (internal quotation marks omitted). But Canales-Vargas argues that the notes and calls, in and of themselves, constitute persecution. While *Navas* tells us that death threats alone can be persecution, it does not specify if all threats — based on a protected ground — are sufficient to establish persecution. *Navas*, 217 F.3d at 658.

**[7]** In *Navas*, the petitioner presented suffering in excess of mere threats. *See id.* ("[Navas's] case involves considerably

more; here, Navas was not only threatened with death, but two members of his family were murdered, he was shot at, and his mother beaten."). In contrast to the petitioner in *Navas*, Canales-Vargas received written and telephone threats that were never carried out. The record indicates that the Shining Path neither confronted Canales-Vargas nor physically harmed her. For these reasons, among others, the IJ found that Canales-Vargas did not suffer past persecution. We uphold the IJ's finding because the evidence does not compel a contrary result. *See Monjaraz-Munoz v. INS*, 327 F.3d 892, 895 (9th Cir. 2003).

### 2. *Future Persecution*

**[8]** Although Canales-Vargas cannot demonstrate past persecution, she may be eligible for asylum relief if she can prove a fear of future persecution. To demonstrate a fear of future persecution on account of a political opinion, Canales-Vargas must show that (1) she holds a political opinion; (2) her political opinion is known to her persecutors; and (3) the persecution will be on account of her political opinion. *See Gonzales-Neyra*, 122 F.3d at 1296.

**[9]** Canales-Vargas satisfies the first and second *Gonzales-Neyra* requirements because the death threats she received were a direct consequence of the speeches she made at a political rally in April 1990. It is obvious to us that she holds a political opinion and that her persecutors are aware of her opinion. Our dissenting colleague makes much of the fact that the death threats received by Canales-Vargas were anonymous. *See* Dissent at 2962-64. Critically, however, our case law does not require a victim of past persecution or an applicant fearing future persecution to marshal direct evidence of her persecutor's (or would-be persecutor's) identity or the precise reason why she has been (or would be) a target of persecution. It is true that, in some cases, "isolated . . . acts perpetrated by anonymous [individuals or groups] do not establish [past] persecution" and will not establish a well-

founded fear of future persecution. *Gormley v. Ashcroft*, 364 F.3d 1172, 1177 (9th Cir. 2004) (citing *Rostomian v. INS*, 210 F.3d 1088, 1089 (9th Cir. 2000)). But in other cases, "the factual circumstances alone" may constitute sufficient circumstantial evidence of a persecutor's identity or motives. *Navas*, 217 F.3d at 657; *see also Deloso v. Ashcroft*, 393 F.3d 858, 865-66 (9th Cir. 2005) (holding that circumstantial evidence of motive may include, *inter alia*, the timing of the persecution and signs or emblems left at the site of persecution). We find that the timing of the threats received by Canales-Vargas, which began two or three weeks after the April 1990 political rally at which she publicly criticized the Shining Path, are sufficient circumstantial evidence that the Shining Path was responsible for the threats and that its motive was to retaliate against Canales-Vargas for publicly criticizing it.[4]

[10] To satisfy the third requirement, Canales-Vargas testified that she received notes and phone calls of escalating severity which eventually threatened her and her family with death if she did not relinquish her political opinion and leave Peru. These threats, made by a recognized terrorist organization, create at least a one-in-ten chance that Canales-Vargas would be severely harmed — if not, killed — if the Shining Path discovered that she had returned to Peru.[5] *See Sael*, 386 F.3d at 925.

---

[4]Moreover, an applicant will be entitled to asylum if "there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant on account of . . . political opinion." 8 C.F.R. § 1208.13(b)(2)(iii)(A). As our dissenting colleague properly notes, the Shining Path is "ruthlessly efficient" at persecuting its political opponents when it wants to do so. Dissent at 2965.

[5]The Government concedes that the Shining Path remains "a terrorist group involved in numerous human rights abuses." In light of the wealth of evidence in the record that this is the case, the Government would be hard pressed to contend otherwise. For example, on April 29, 1994, the Latin America Institute of the University of New Mexico wrote that "[g]uerrillas from Sendero Luminoso [Shining Path] have staged a series of ambushes against the military, plus bloody attacks against civilians in

The IJ gave two reasons as to why he believed that Canales-Vargas' fear of future persecution was not well founded.[6] First, the IJ found that during the seven months that Canales-Vargas remained in Peru, "certainly, the Shining Path could have reached her and punished her . . . . [but t]hey did not do anything." It is true that the Shining Path did not personally confront or physically harm Canales-Vargas in the seven months that she remained in Peru. But over that period of time, the threats that she received increased in severity, and she left Peru for the United States promptly after receiving the last threatening phone call in November 1990. We do not fault Canales-Vargas for remaining in Peru until the quantity

recent weeks." U.N.M. Latin Am. Inst., *Peruvian Military Continues Offensive Against Sendero Luminoso Amid Growing Charges of Human Rights Abuses*, NOTISUR-LATIN AM. POL. AFF. (April 29, 1994), *available at* http://ssdc.ucsd.edu/news/notisur/h94/notisur.19940429.html. According to David Montoya, a terrorism expert at the Center for Development Studies, a prestigious Lima-based think tank, the Shining Path is present in fifteen of Peru's twenty-four provinces. Allen Scrutton, *Left for Dead, Peru's Rebels Regroup*, S.F. CHRON., Aug. 14, 1995, at A6. A March 1995 State Department report noted that the "Sendero Luminoso continued to assassinate civilians, including peasants, farmers, villagers, indigenous people, civil authorities and public servants . . . ." 1995 U.S. Dep't of State, Peru: Country Reports on Human Rights Practices: 1994 (Mar. 1995). The same report says that "[t]here are credible accounts that Sendero tortured people to death by means such as slitting throats, strangulation, stoning, and burning. In August Sendero sympathizers tortured four people they accused of cooperating with the police . . . for 3 days before killing them." *Id.*

[6]Our dissenting colleague lauds the IJ's "carefully considered . . . thoughtful and well-reasoned opinion." Dissent at 2964; *see also id.* at 2968 ("The IJ closely reviewed the record . . . ."). But that does not necessarily mean that substantial evidence, when viewed through the proper lens, will support an IJ's decision. In political opinion cases like this, the asylum applicant must show that he or she "faces the prospect of . . . persecution[ ] *because* of [his or her] political opinion." *Navas*, 217 F.3d at 656 (emphasis in original); *see also Njuguna*, 374 F.3d at 770 ("He must establish that the political opinion would motivate his potential persecutors."). Canales-Vargas' testimony about the notes and phone calls she received easily satisfy this requirement.

and severity of the threats that she received eclipsed her breaking-point. Indeed, our precedents tell us that we cannot. *See, e.g., Gonzalez v. INS*, 82 F.3d 903, 909 (9th Cir. 1996) (noting that there is no "rule that if the departure was a considerable time after the first threat, then the fear was not genuine or well founded"); *Damaize-Job v. INS*, 787 F.2d 1332, 1336 (9th Cir. 1986) (two-year stay in Nicaragua after release from persecutors' custody not determinative).

The IJ also found that "it is quite remote and quite unlikely that, given the fact that [Canales-Vargas] has been away from Peru for approximately six years, actually, more than six years, that the Shining Path would be interested in her at this point in time." Our dissenting colleague echoes this concern by stressing that, now, after this case has percolated up from the IJ to the BIA and to this court, "the threats in this case are almost fifteen years old." Dissent at 2966. Certainly, the age of the threats that Canales-Vargas received are relevant to our evaluation of the reasonableness of Canales-Vargas' fear. And if we were required to find a "certainty of persecution or even a probability of persecution," *Hoxha*, 319 F.3d at 1184, our conclusion might be different. But when evaluating an asylum applicant's future persecution claim, as we do here, we apply a much lower standard, which requires us to find only a "ten percent chance that the applicant will be persecuted in the future." *Sael*, 386 F.3d at 925. In light of the Shining Path's "ruthless[ ] efficien[cy]" in persecuting its political opponents — to borrow our dissenting colleague's words, Dissent at 2965 — we have no trouble concluding that Canales-Vargas satisfies this low standard. *See Cardenas v. INS*, 294 F.3d 1062, 1064, 1067 (9th Cir. 2002) (finding well-founded fear based on nine year-old Shining Path threats).

**[11]** In sum, reversal of the IJ's denial of Canales-Vargas's asylum application is warranted because "the evidence would compel any reasonable factfinder to conclude that the requisite fear of persecution has been shown." *Navas*, 217 F.3d at 657; *see also Kahssai v. INS*, 16 F.3d 323, 329 (9th Cir. 1994)

(per curiam) (Reinhardt, J., concurring) ("The fact that [petitioner] did not suffer physical harm is not determinative of her claim of persecution: there are other equally serious forms of injury that result from persecution.").

## III. Withholding of Deportation

### A. Applicable Legal Standard

**[12]** An applicant is entitled to withholding of deportation if he or she can establish a "clear probability," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987), that his or her "life or freedom would be threatened" upon return because of his or her "race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1231(b)(3)(A); *see also Thomas v. Gonzales*, 409 F.3d 1177, 1182 (9th Cir. 2005) (en banc). This "clear probability" standard, interpreted as meaning "more likely than not," is more stringent than asylum's "well-founded fear" standard because withholding of deportation is a mandatory form of relief. *Navas*, 217 F.3d at 655. A petitioner who establishes eligibility for asylum raises a presumption of entitlement to withholding of deportation. *See Salazar-Paucar v. INS*, 281 F.3d 1069, 1077 (9th Cir.), *amended by* 290 F.3d 964 (9th Cir. 2002); *see also Cardoza-Fonseca*, 480 U.S. at 430; *INS v. Stevic*, 467 U.S. 407, 424 (1984).

### B. Analysis

**[13]** While Canales-Vargas's testimony "compel[s] any reasonable factfinder to conclude" that she faces at least a ten percent chance of future persecution, her testimony does not establish that it is "more likely than not" that she will suffer future persecution. *Navas*, 217 F.3d at 655, 657. That is, although Canales-Vargas has demonstrated a well-founded fear of future persecution, she has not shown that she faces a "clear probability" of persecution if removed. *Id.* at 655. The non-confrontational threats that Canales-Vargas received

almost thirteen years ago establish a ten-percent possibility of future persecution but not the clear probability of it. Without proving a clear probability of persecution, and lacking sufficient evidence of past persecution, Canales-Vargas is not entitled to withholding of deportation. Thus, we affirm the IJ's conclusion that Canales-Vargas is not entitled to withholding of deportation.

## CONCLUSION

For the reasons set forth above, we grant the petition for review in part and find that Canales-Vargas has established a well-founded fear of future persecution and is therefore eligible for asylum. However, we deny the petition for review of the IJ's denial of withholding of deportation, as we do not consider the evidence strong enough to meet the higher standard for that form of relief. We also find that Canales-Vargas has failed to meet the "continuous presence" element required for suspension of deportation.

## PETITION GRANTED IN PART and REMANDED.

KOZINSKI, Circuit Judge, dissenting:

We have never before held that anonymous death threats, without a scintilla of corroborating harassment, compel a finding that an asylum seeker's fear of persecution is well founded, and I cannot join the majority in interfering, yet again, with the ability of Immigration Judges to do their jobs. Petitioner doesn't allege she endured any harassment other than anonymous threats—not beatings, not detention, not face-to-face confrontation—to support her claim that she will be persecuted if she returns to Peru. The majority nevertheless holds not merely that a reasonable factfinder *could* have determined that Canales-Vargas has a well-founded fear of future persecution, but that a reasonable factfinder would be

*required* to so find. *See INS* v. *Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). This conclusion contravenes both Supreme Court and circuit precedent requiring deference to the administrative agency.

The majority concedes, as it must, that the handful of anonymous threats petitioner received doesn't amount to past persecution. *See* maj. at 2955-56. So our cases holding that "death threats alone can constitute persecution," *Navas* v. *INS*, 217 F.3d 646, 658 (9th Cir. 2000), are entirely beside the point. *Navas* stands for the unremarkable proposition that the harm inflicted by living under threat of death can sometimes be severe enough to constitute persecution. The majority thus correctly notes that "[t]he fact that [petitioner] did not suffer physical harm is not determinative of her claim of persecution." Maj. at 2961 (second alteration in original) (quoting *Kahssai* v. *INS*, 16 F.3d 323, 329 (9th Cir. 1994) (per curiam) (Reinhardt, J., concurring)). And it cites other cases stating that death threats alone can constitute persecution. *See, e.g.*, *Khup* v. *Ashcroft*, 376 F.3d 898, 903 (9th Cir. 2004); *Rios* v. *Ashcroft*, 287 F.3d 895, 900 (9th Cir. 2002). But all of these authorities are irrelevant once the majority holds, as it must, that petitioner hasn't been persecuted.

The only remaining question is whether petitioner, who was not persecuted in the past, nevertheless has a well-founded fear of future persecution. Since the IJ found that she had no well-founded fear, our role is a limited one: to examine the record and decide whether it *compels* the conclusion that the IJ erred in this regard. *See Elias-Zacarias*, 502 U.S. at 481. And what does the record show? Over fifteen years ago, petitioner spoke out against the Shining Path in a five-to-ten minute speech before a crowd of 250 people. A few weeks later, an anonymous letter appeared under her door, warning her to keep her mouth shut. Over the next seven months, the harassment escalated—four or five more letters followed, along with a number of threatening telephone calls. The most menacing threatened to place a bomb in petitioner's home and

kill her family. The letters and callers never claimed to be associated with the Shining Path, so petitioner can't be sure who made the threats.[1] Throughout that period, the threats never materialized—petitioner was never injured in any way, or even confronted face to face, before she left for the United States.

The Immigration Judge (IJ) carefully considered this evidence, and rendered a thoughtful and well-reasoned opinion.[2] The IJ gave two reasons that petitioner's fear of future persecution was not well founded: First, during the seven months that she remained in Peru, "[c]ertainly, the Shining Path could have reached her and punished her if they thought that's what they wanted, for her failure to leave promptly. They did not do anything." Second, "it is quite remote and quite unlikely that, given the fact that she has been away from Peru for approximately six years, actually, more than six years, that the Shining Path would be interested in her at this point in time."

The majority rejects the IJ's reasons, and holds that "[t]hese threats, made by a recognized terrorist organization, create at least a one-in-ten chance that Canales-Vargas would be severely harmed — if not, killed — if the Shining Path discovered that she had returned to Peru." Maj. at 2958. The majority's opinion can only be read to announce a per se rule that any death threat from a group capable of carrying through on it requires a finding that the petitioner's fear of persecution is well founded. The majority's only authority for this dubious proposition is *Sael* v. *Ashcroft*, 386 F.3d 922, 925 (9th Cir. 2004), which said nothing of the sort. Sael endured a lot more

---

[1]Petitioner claims in her opening brief that she was shot four times by Shining Path terrorists in Peru and that she identified her assailant. Were these claims true, this would be a very different case. But as the government noted in its brief, these facts are nowhere to be found in the record, and probably come from a different case entirely.

[2]Although he expressed some doubt as to petitioner's credibility, he made no express adverse credibility finding, so we accept her testimony as true. *See Kalubi* v. *Ashcroft*, 364 F.3d 1134, 1137-38 (9th Cir. 2004).

than threats to cause her to fear persecution: Her car tires were slashed, her house was stoned, and a mob attempted to break into her house. *See id.* at 927.

We have never held that anonymous threats, without more, compel a finding that a fear is well founded. We have always required the petitioner to demonstrate some corroborating facts in addition to the threats to show that the threats should be taken seriously. For example, in *Marcos* v. *Gonzales*, 410 F.3d 1112 (9th Cir. 2005), the petitioner joined a network of amateur radio operators who reported guerilla group activity to the Philippine Army. *Id.* at 1115-16. For several years, he received ten death threats a month over the radio, and telephone death threats three to five times daily at his house. *Id.* at 1116. In addition, guerillas confronted him in person and repeated the threats both at his house and at his office. *Id.* The police took these threats seriously enough to provide him special protection at work. *Id.* And in other threat cases, the threats were also backed up by in-person confrontation, or worse. *See, e.g.*, *Kaiser* v. *Ashcroft*, 390 F.3d 653, 658 (9th Cir. 2004) (family members followed by death squad); *Siong* v. *INS*, 376 F.3d 1030, 1039 (9th Cir. 2004) (attacks on four friends).

Had the majority analyzed the facts of Canales-Vargas's case under our caselaw, it would have been compelled to affirm for the two reasons the IJ gave. First, the IJ noted that "if the Shining Path really intended to harm her or her family, they had plenty of time to do that." As the majority emphasizes, when the Shining Path wants to persecute political opponents, it is ruthlessly efficient at doing so. *See* maj. at 2958-59 n.5. But by petitioner's own testimony, we know that the rebels knew who she was and where she lived, yet they never bothered to confront her directly, much less attempt to act on their threats.

The majority nevertheless rejects the IJ's reasoning, noting that the threats increased in severity over time and that peti-

tioner left Peru promptly after the last one. Neither observation undermines the IJ's reasoning. The majority also cites two cases, *Gonazalez* v. *INS*, 82 F.3d 903, 909 (9th Cir. 1996), and *Damaize-Job* v. *INS*, 787 F.2d 1332, 1336 (9th Cir. 1986), for the proposition that a quiet period during which the persecutors don't act on their threats isn't determinative. It's true that the fact "that none of the threats against Petitioners have yet to be carried out does not render their fear unreasonable." *Kaiser*, 390 F.3d at 658. Otherwise, death threats could never support a future persecution finding. "What matters is whether the group making the threat has the will or the ability to carry it out." *Bolanos-Hernandez* v. *INS*, 767 F.2d 1277, 1285 (9th Cir. 1985). Under *Lim* v. *INS*, 224 F.3d 929 (9th Cir. 2000), a period where rebels don't make good on their threats is "relevant," *see id.* at 935, because a lengthy period without harm suggests that the terrorists didn't have the will to carry through with their threats.

In the two cases that the majority cites, there wasn't any doubt that the government was willing to make good on its threats: In *Damaize-Job*, the government threatened petitioner with death after imprisoning and torturing him for three months. Petitioner's uncle and sister had disappeared, likely murdered by the government. *See Damaize-Job*, 787 F.2d at 1334. Likewise, in *Gonzalez*, government soldiers personally threatened the petitioner, and her family members were imprisoned and beaten. *See Gonzalez*, 82 F.3d at 906. But Canales-Vargas can't point to *anything* in the record, much less physical violence, corroborating willingness and ability to carry out the threats.

This is reason enough to deny the petition, but the IJ gave us more: The threats in this case are almost fifteen years old. The older threats get, the more likely it is that the persecutors have moved on to other targets. For example, in *Prasad* v. *INS*, 47 F.3d 336 (9th Cir. 1995), we found the petitioner's fear of persecution wasn't well founded in part because there was no evidence that the government had any continuing

interest in him. *Id.* at 339; *see also Useinovic* v. *INS*, 313 F.3d 1025, 1032-33 (7th Cir. 2002) (noting that petitioner "did not suffer severe consequences for his actions at the time he acted, and the passage of time since these activities only lessened the likelihood he would face any persecution"). Nor is there any evidence that, as in other Shining Path cases, *see, e.g.*, *Gonzales-Neyra* v. *INS*, 122 F.3d 1293, 1295 (9th Cir. 1997), the guerillas have attempted to keep track of petitioner's whereabouts after she left Peru.

The majority concedes that "the age of the threats that Canales-Vargas received are relevant to our evaluation of the reasonableness of Canales-Vargas' fear." Maj. at 2960. And then it concedes that the age of the threats may bring the likelihood that Canales-Vargas will be persecuted below fifty percent. *Id.* But it can't quite bring itself to admit that the age of the threats would allow a reasonable IJ to conclude that the likelihood of future persecution is below ten percent. The majority doesn't explain why not. Instead, it cites to *Cardenas* v. *INS*, 294 F.3d 1062, 1064, 1067 (9th Cir. 2002), where we found a well-founded fear based on threats from the Shining Path that were nine years old. But in *Cardenas*, the Shining Path suspected the petitioner of informing the government about its activities, in part because his brother was a policeman. The Shining Path responded by painting threats in public view on Cardenas's house. The petitioner, scared for his life, agreed to help the Shining Path smuggle supplies, but he reneged on the deal. Shining Path members were angry enough to track him and his family throughout the country, threatening them again after they moved from their hometown in Lima to a smaller town, and still again when they returned to Lima six months later. We concluded that the Shining Path's interest in Cardenas was so strong that it was unlikely to have waned over time. There's nothing like that here—no public threats, no anger at broken deals, no stalking in another Peruvian city. It wasn't unreasonable for the IJ to look at the evidence and conclude that lo these many years later, the Shining Path is likely to have moved on to other targets.

When we review an IJ's findings, our job is to examine the facts in light of the IJ's reasoning and determine whether it is supported by substantial evidence. The majority has substituted its own judgment for the IJ's, and announced that ancient death threats compel a finding that a petitioner's fear of persecution is well founded today. This approach finds no support in our caselaw. The IJ closely reviewed the record, and gave reasons for his decision that are supported by substantial evidence. We must affirm.